Kenneth E. Aldous (KA-9526)
**ALDOUS PLLC**
555 Fifth Avenue, 17th Floor
New York, New York 10017
(212) 856-7281 (tel)
(646) 603-9363 (fax)
kaldous@aldouspllc.com

*Attorneys for Plaintiff*
*Walkie Check Productions, LLC*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WALKIE CHECK PRODUCTIONS, LLC, | : | Case No.: |
| Plaintiff, | : | ECF Case |
| - against - | : | |
| VIACOMCBS INC., BLACK ENTERTAINMENT TELEVISION LLC d/b/a BET NETWORKS, and BET PRODUCTIONS IV, LLC, | : | **COMPLAINT** |
| | : | (JURY TRIAL DEMANDED) |
| Defendants. | : | |

Plaintiff Walkie Check Productions, LLC ("Plaintiff" or "Walkie Check"), by its

attorneys, Aldous PLLC, as and for its Complaint against Defendants ViacomCBS Inc., Black

Entertainment Television LLC d/b/a BET Networks, and BET Productions IV, LLC

(collectively, "Defendants"), alleges as follows:

### NATURE OF THE ACTION

1.      This is an action to recover damages from Defendants, arising out of Defendants'

wrongful appropriation and illegal theft of a show titled "House Party" ("House Party"),

including claims for copyright infringement, 17 U.S.C. §§ 106, 501 (first cause of action),

implied contract/*quantum meruit* (second cause of action), and unjust enrichment (third cause of

action).

2.      Plaintiff created and developed "House Party" as presented to Defendants. Plaintiff pitched "House Party" (in person and via phone and e-mail) to Defendants over a period of years, beginning in mid-2015.

3.      As evidenced by many e-mail exchanges between the parties, and their extended information-delivery and negotiation process – and despite Defendants expressly acknowledging Plaintiff's creation and ownership of the show title, concept, distribution strategy, and format – Defendants wrongfully appropriated and illegally stole Plaintiff's intellectual property, deceived Plaintiff, and launched the show on March 29, 2020 (via Instagram Live).  Thereafter, Defendants continued to host "House Party" (on Instagram Live and Facebook Live), without providing Plaintiff any compensation, credit, or recognition.

4.      By breaching their implied contract with Plaintiff, engaging in bad-faith negotiations with Plaintiff, and infringing on Plaintiff's registered copyright via the commercial distribution of "House Party," Defendants have caused significant damages to Plaintiff and have been unjustly enriched, in an amount to be determined at trial.

## **THE PARTIES**

5.      Plaintiff WALKIE CHECK PRODUCTIONS, LLC is a limited liability company, organized and existing under the laws of the State of New York, with its principal place of business located at 260 West 52nd Street, New York, New York 10019.

6.      Upon information and belief, Defendant VIACOMCBS INC. ("Viacom") is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located at 1515 Broadway, New York, New York 10036.  Viacom operates as a worldwide multi-media and entertainment company and controls and/or owns a majority in interest (either directly or indirectly) in BET (*see* ¶ 7, *infra*) and BET IV (*see* ¶ 8, *infra*).

7.     Upon information and belief, Defendant BLACK ENTERTAINMENT

TELEVISION LLC d/b/a BET NETWORKS ("BET") is a limited liability company, organized

and existing under the laws of the District of Columbia, with its principal place of business

located at 1515 Broadway, New York, New York 10036.  BET, an indirect subsidiary of

ViacomCBS, Inc. (*see* ¶ 6, *supra*), is a leading provider of entertainment, music, news, and

public-affairs television programming.

8.     Upon information and belief, Defendant BET PRODUCTIONS IV, LLC ("BET

IV") is a limited liability company, organized and existing under the laws of the State of

Delaware, with its principal place of business located at 1515 Broadway, New York, New York

10036.  BET IV is a (direct or indirect) subsidiary of BET (*see* ¶ 7, *supra*) and ViacomCBS Inc.

(*see* ¶ 6, *supra*).

## JURISDICTION AND VENUE

9.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 (civil actions arising under the Constitution, laws, or treatises of the United States), 28

U.S.C. § 1338(a) (any act of Congress relating to patents and copyrights), 28 U.S.C. § 1338(b)

(unfair competition claim joined with a substantial and related claim under copyright or patent

law), and 28 U.S.C. § 1367 (supplemental jurisdiction).

10.    This Court has personal jurisdiction over Defendants by virtue of Defendants,

upon information and belief, residing and maintaining offices in this District and transacting

business in the State of New York and in this District, including but not limited to doing business

with Plaintiff at various locations in Manhattan, operating interactive websites, and selling

products to residents in this District.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because

Defendants reside in this District and a substantial part of the events and omissions giving rise to

Plaintiff's claims occurred in this District.  Upon information and belief, Defendants are headquartered and based in New York and the show that is the subject of this complaint has been produced and filmed in this District.  Venue also is proper in this District pursuant to 28 U.S.C. §§ 1391(c) and 1400(a) because Defendants are subject to personal jurisdiction, and reside, in this District.

**FACTUAL BACKGROUND**

12.     After running into BET's Michael Siegman ("Siegman"), outside of the restaurant, PJ Clarke's (on West 63rd Street and Broadway in Manhattan), Steven Lebowitz of Walkie Check ("S. Lebowitz"), e-mailed Siegman on May 26, 2015 about exploring the idea of partnering with BET on a new project and inviting Siegman to meet a colleague with a former history with Viacom.  The same day, Siegman e-mailed S. Lebowitz, stating:  "Hopefully the opportunity will work out.  Let's keep in touch."

13.     On July 8, 2015 at 4:00 p.m., Siegman met with S. Lebowitz, Joshua Lebowitz, Esq., CEO of Walkie Check ("J. Lebowitz"), and Tad Low ("Low") of TAD2000, Inc. d/b/a Spin The Bottle ("STB") who together pitched Siegman the "House Party" show, as well as the idea of working with BET on taping some "Music Matters" segments, based on input from S. Lebowitz's viewing of the BET Awards.  At the time, it was anticipated that "House Party" would be filmed primarily at STB's brownstone located at 9 West 29th Street (the "Brownstone").

14.     Immediately after the July 8 meeting, J. Lebowitz e-mailed, stating:  "Excited about the opportunity to work with BET, whether it means them using the STB space or producing our own shows for them."  J. Lebowitz included a copy of his updated "Meeting Notes" that he had prepared for the meeting and included:

(1) BET Connection: BET Honors, Rip the Runway – Have worked in talent department for many years.  Understand the value and goals of the brand.  (2) Viacom Family Production History . . . (3) Programming Fit: Already have the Post-Show . . . and Sessions – now time for the Post-Party with Live Performances.  Can showcase "Music Matters" performers, integrate new technology, and build the BET brand.  Allows for drop-ins by existing BET talent and as a launchpad for the newest stars.  (4) Social: Show is tailor-made for social and will incorporate new technologies, such as Periscope and Meerkat, during rehearsals and pre-production to build a buzz and excite viewers for "day and date" tune in.  (5) Sponsorship: Have interested sponsors that can be seamlessly integrated into the programming.

15.     On August 14, 2015 (at 2:00 p.m. (EST)), Siegman and Constance "Connie" Orlando, BET's then Senior Vice President (Specials, Music, and News) ("Orlando"), visited the Brownstone to meet with S. Lebowitz, J. Lebowitz, and Low.  Following a tour, those present discussed the show title, concept, format, and distribution strategy of "House Party," together with the possibility of shooting various performances and programming at the venue.  Subsequent to the tour, Siegman shared that he had discussed a couple of options with his advertising sales team and planned to shoot two or three "sizzle reels" in October.

16.     On August 25, 2015 (at 4:30 p.m. (EST), S. Lebowitz, J. Lebowitz, Low, Orlando, Siegman, and Michael Moss, BET Original Programming, participated in a conference call to discuss next steps.

17.     On September 2, 2015 (at 1:00 p.m. (EST)), Orlando, Malik Buie, BET Music Matters ("Buie"), and Jermaine Hall, BET's Vice President (Digital) ("Hall"), visited the Brownstone to meet with S. Lebowitz, J. Lebowitz, and Low.  In addition to discussing a shoot for "Music Matters," it was agreed that Walkie Check would visit the BET offices to discuss further their original concept, "House Party."

18.     On Monday, September 21, 2015 (at 4:00 p.m. (EST)), S. Lebowitz, J. Lebowitz, and Low met with Orlando and, from her BET team, Jamal Noisette ("Noisette"), at BET

Networks at 524 West 57th Street, 9th Floor, New York, New York.  When asked by Orlando how often Walkie Check envisioned "House Party" being distributed, S. Lebowitz replied, "Every day."

**"House Party" Materials Are Submitted to Defendants.**

19.     Subsequent to the fourth in-person meeting, on September 30, 2015, BET was sent all of the relevant production materials for 12 episodes of "House Party," including, among other things, the One-Sheet and Format (the "House Party Materials").  Shortly thereafter, BET proceeded to ask for a budget for two episodes and, on October 22, 2015 (at 5:00 p.m. (EST)), S. Lebowitz, J. Lebowitz, Low, and Noisette participated in a conference call to go over the House Party Materials.

20.     On October 29, 2015, BET visited the Brownstone again, along with an R&B artist and a large team, to schedule a live-streamed performance and Q & A for November 18th.

21.     On November 17, 2015, after much time spent inducing facilitation of a successful shoot, BET indefinitely postponed the live-stream event and said that it would need to feature a different artist.  S. Lebowitz suggested a jazz vocalist (subsequently nominated for a Grammy award), whom he had recently worked with, as a potential replacement.

22.     On November 23, 2015, BET visited the Brownstone again.  Afterwards, in an e-mail with the subject line "House Party – Follow Up," attempts were made to lock in a proposed shoot date for "House Party" for mid-to-late January.

23.     On November 30, 2015, Walkie Check learned that the "House Party" shoot would need to be moved to a later date.  Supposedly, this was due to the fact that BET recently had acquired a few additional programming networks and that there were about to be some "major programming changes as far to where music programming lives."  This was now the second project that BET had stalled on, wasting Walkie Check's time and resources.

24.     On December 1, 2015, Siegman, Orlando, S. Lebowitz, J. Lebowitz, and Low had a phone call and discussed ways to keep the show moving along.  During such call, BET apologized for their process and delays.

25.     On December 2, 2015, S. Lebowitz, while at 30 Rockefeller Plaza in Manhattan, discussed, with a multiple Grammy award-winning performer's management team, the possibility of such performer appearing on "House Party."

26.     On December 4, 2015, Walkie Check shared a new format for House Party with Orlando, Siegman, and Noisette, describing the show as "organic unscripted . . . that borrows the popular Periscope POV to connect with the social-media-obsessed audience [in] an innovative way to promote BET personalities and talk to your viewing audience on a regular basis."

27.     On December 11, 2015, Noisette and a BET exec from DC, Sam Walker ("Walker"), visited the Brownstone again and on December 18, 2015 (at 3:00 p.m. (EST)), another "House Party – Follow Up" call took place among S. Lebowitz, J. Lebowitz, Low, Orlando, and Noisette.

28.     On February 9, 2016 (at 9:18 p.m. (EST)), in an attempt to push "House Party" forward with BET, S. Lebowitz e-mailed Siegman an article entitled, "Viacom CEO Defends His Leadership."  On February 11, 2016 (at 2:52 p.m. (EST)), Siegman replied:  "Yea, I saw the same thing.  There are a ton of moving parts.  I want to make something happen too!"

**Defendants Revive "House Party"**
**and Agree to Primary Economic Terms.**

29.     On March 23, 2016 (at 12:00 p.m. (EST)), S. Lebowitz, J. Lebowitz, Low, Orlando, and Siegman met on the second floor at The Lambs Club (at 132 West 44th Street in Manhattan).  Orlando and Siegman apologized for the delay in moving things along on "House Party," reiterated their determination to bring the concept to fruition with BET, again discussed

the possibility of placing the show on a digital network or via social platforms with various talent, thanked Walkie Check for its patience and persistence, and again agreed to get back on track with a targeted shoot for May.

30.     Reassured by the lunch at The Lambs Club, Walkie Check met with a line producer to work on and ensure that the show's newly proposed budget for two pilot episodes was in line with BET's expectations and closer to the $80,000 proposed for launch on a digital network (rather than the original $122,000 planned for distribution on BET's primary linear network). Walkie Check also revised the show format and reached out to potentially interested brands.

31.     After receiving the revised budget, and realizing the need to lock in tape dates and complete staffing, a meeting was set up for April 20, 2016 (at 11:30 a.m. (EST)) to include, among others, Wayne Brooks ("Brooks"), Jordan Benston ("Benston"), Amanda Booz ("Booz") and Renee Smith ("Smith").

32.     On April 20, 2016 (at 11:30 a.m. (EST)) another "House Party Follow-Up Meeting" was held (in a conference room at 1540 Broadway in Manhattan) during which the "House Party" show was thoroughly discussed.

33.     On April 25, 2016 (at 11:00 a.m. (EST)), BET received yet another venue walk-through of the Brownstone. This walk-through was substantially similar to each of the prior ones and was to be followed up by a call with the BET talent department. Invited were Benston, Brooks, Booz, Smith, Yomi Desalu ("Desalu"), and Buie (copying Orlando and Siegman).

34.     On May 5, 2016 (at 1:29 p.m. (EST)), Rakiat Gbadamosi ("Gbadamosi"), of BET Networks Business and Legal Affairs, sent a draft agreement for "the project currently known as House Party." Walkie Check's attorney reviewed the draft agreement and it was returned, with comments, to BET.

35.     On May 10, 2016 (at 2:30 p.m. (EST)), a "House Party Talent Call" was held which included S. Lebowitz, J. Lebowitz, Low, Noisette, Smith, Brooks, Tracy Cloherty, Devonne Jackson, and Booz.

36.     On May 31, 2016 (at 5:21 p.m. (EST)), Gbadamosi, of BET Networks Business and Legal Affairs, sent back a revised draft agreement with additional comments.

37.     On June 1, 2016, J. Lebowitz e-mailed S. Lebowitz and Low notes about the latest draft agreement, including concerns about:  BET owning the concept after shooting the pilots; BET potentially taking "House Party" elsewhere without Walkie Check's involvement; BET's lack of a reference to a break fee for "House Party" after already being in discussions with Walkie Check for a year; and BET's failure to mention profit sharing from sponsorships, which had been previously agreed to by BET.

38.     The draft agreement purported to transfer to BET Productions IV, LLC, all elements created, or to be created at any time for, or in connection with, "House Party," whether or not used in "House Party," including without limitation, all performances, ideas, suggestions, themes, plots, stories, characters, characterizations, dialogues, titles, sets, settings, formats and other materials, whether or not in writing.

39.     The draft agreement further stated that any such "House Party" materials would be deemed a work made for hire for BET under United States copyright law, and that BET would be considered the author and, at all stages of completion, the sole and exclusive owner of all right, title, and interest in and to the "House Party" materials.

40.     When Plaintiff rejected these demands and Defendants failed to acquire Plaintiff's rights to "House Party" via lawful means, Defendants simply stole it.

**Defendants Delay Launch of "House Party" Yet Again and
Refuse to Pay Walkie Check Any Compensation for Its Work.**

41.     On July 8, 2016 (at 1:36 p.m. (EST)) – after weeks of back and forth messages, including those referencing the importance of Walkie Check being locked in for the life of the series and the continued delays by BET – Siegman explained that BET had decided not to move forward with the "House Party" project.  Low then sent an e-mail to Orlando, with the subject line "House Party – Update" (copying Siegman, Noisette, Benston, S. Lebowitz, and J. Lebowitz), noting:

> Connie, We heard from Mike Siegman this morning that you and the network have decided not to move forward with the "House Party" project.  We're disappointed that we won't be working with you and your team, particularly given the amount of effort, time and enthusiasm we had all put into the project.  We also continue to believe the idea is extremely timely and innovative.  That said, we understand your budget and scheduling constraints at this time and look forward to working with you on new projects for both your linear and digital networks.  Best regards, Tad, Josh & Steve.

42.     On July 10, 2016, while at a rehearsal for VH1 Hip Hop Honors:  All Hail The Queens at Geffen Hall at Lincoln Center, S. Lebowitz and J. Lebowitz approached Noisette in the center of the house to discuss "House Party."  Noisette expressed his dismay with the process and said he agreed that Walkie Check was entitled to some sort of payment (*e.g.*, a "break fee") for the work done thus far on "House Party."

43.     On July 18, 2016 (at 9:09 p.m. (EST)), Orlando sent an e-mail to Low (copying Siegman, Noisette, Benston, S. Lebowitz, and J. Lebowitz), replying to the "House Party – Update," stating:  "Sorry for the delay.  Yes, we are sad over here too but we should pick up talks when the new fiscal begins!  Hoping all is well and we will talk soon.  Best, Connie."

44.     On July 25, 2016 (at 3:19 p.m. (EST)), S. Lebowitz sent an e-mail to Orlando (copying Siegman and J. Lebowitz) stating:

> Connie, Hope you had a great weekend.  We'll take the high road on House Party, again because there's less traffic, but that's extremely unfair to us.  We've spent over a year in discussions with your team, lined up sponsors and talent (after your continued encouragement), and even spent money on contract negotiations.  We've offered BET a timely show, a valuable location for all of Viacom, and helpful insight, yet throughout the process there's appeared to be no fierce urgency of now.  Patience is the key element to success, but truly felt it was necessary to remind you of our experience thus far.  Looking forward to seeing you soon. – Steve.

45.    On July 25, 2016 (at 10:48 p.m. (EST)), Orlando replied to S. Lebowitz (copying Siegman and J. Lebowitz), stating:

> Thanks Steve, I appreciate you reaching out.  I hope you know this wasn't intentional, we ALL tried to get this done (your side and ours) but unfortunately we couldn't get it done in the right time frame.  The months of negotiation and trying to get it on budget didn't help anything.  We have always and still think it was a great idea and you know we LOVE the location.  Mike and I tried to revive it after the first time because it was something we believed in.  In regards to sponsors, I'm not sure how sponsors were involved without consulting our sales team but apologies for any inconvenience this has caused you all.   Be well and hopefully we will talk soon.  Best, Connie.

**Defendants Again Reengage with Walkie**
**Check About Launching "House Party."**

46.    On August 16, 2016 (at 11:06 p.m. (EST)), S. Lebowitz sent an e-mail to Siegman about recent media events, stating:  "Our House Party show . . . will be more valuable and a workhorse for BET for years to come.  Looking forward to seeing you soon."

47.    On October 24, 2016 (at 9:36 a.m. (EST)), S. Lebowitz sent an e-mail to Orlando, including a Wall Street Journal article about AT&T's deal with Time Warner, entitled "AT&T Dreams of a Hollywood Ending," stating:

> Connie, Hope you had a great weekend and enjoyed the party at the White House.  As vertical integration grows with ATT & Time Warner, it's a great time to push forward with our House Party Show.   Shot vertically it would create more innovation

opportunities in advertising and become a mainstay at BET for years to come. Looking forward to seeing you soon. Steve.

48.     On March 14, 2017 (at 3:17 p.m. (EST)), S. Lebowitz sent an e-mail to Orlando and Siegman, entitled "House Party – Update," including a Financial Times article entitled "Google and Facebook build digital ad duopoly Two companies act as gatekeepers as online spending overtakes television" and stating:  "Hope this FT information is helpful in your discussions with various brands.  Looking forward to catching up with you soon."

49.     On April 22, 2017 (at 10:46 a.m. (EST)), Orlando sent an e-mail to S. Lebowitz, stating:

> Hey Steven, We have up fronts next week but you should meet with the heads of my Music Programming and Special teams, YD and SW.  I have handed this over to them as I takeover my new role. Thanks!

A few hours later, Desalu replied:  "Thank you Connie; and greetings Steve, Please feel free to reach out to discuss further; looking forward to hearing about your upcoming projects.  Yomi."

50.     On April 24, 2017 (at 6:45 p.m. (EST)), S. Lebowitz e-mailed Desalu, entitled "House Party – Update," stating:  "Yomi, Looking forward to reconnecting with you.  Would like to come by your offices the first week of May . . . Joining our meeting would be Tad Low and Josh Lebowitz. –Steve."

51.     On May 23, 2017 (at 12:17 p.m. (EST)), Desalu e-mailed S. Lebowitz, stating:  "Steve, We've actually lost a few people from today's meeting with BETX madness.  Is there any way to reschedule?"

52.     On May 23, 2017 (at 2:04 p.m. (EST)), S. Lebowitz sent an e-mail, with the subject "House Party – Update" to Desalu, Walker, Noisette, Buie (copying J. Lebowitz and Low), stating:  "Yomi, As you can see from previous emails, our discussions with BET have taken quite some time.  Does this Friday, May 26th, at 3 p.m. EST work for you?  --Steve."  Four

hours later, Desalu replied:  "That's actually the first official half day, and with it being a holiday

weekend my guess if they attendees would be scattered.  Might a call suffice to initiate this

conversation?"  S. Lebowitz further replied:  "Are you and your team available for a phone call

on Friday, 5/26, at noon?   Otherwise, which date would be best for an in-person meeting (as

we've had this meeting on our calendars for quite some time)?"

53.    On June 2, 2017 (at 10:00 a.m. (EST)), S. Lebowitz sent an e-mail to Desalu, with

the subject "House Party – Update," stating:  "Any update to your availability to meet on June

12th at 3 p.m. EST at 1540 Broadway?"  Desalu replied:  "Yes, lets lock.  Please send any

materials in advance day of for those who cannot physically attend the meetings."

54.    On June 9, 2017 (at 7:07 a.m. (EST)), S. Lebowitz sent an e-mail to Orlando, with

the subject "House Party – Update," stating:  "Connie, Meeting with some of your colleagues

from BET on June 12th at 3 p.m. EST at 1540 Broadway."  Orlando replied:  "Hey Steve, That's

great to hear, let me know how it goes!!!"  At 2:11 p.m. (EST), S. Lebowitz then e-mailed

Siegman, stating:  "Mike, Joining me [at the meeting] will be Tad Low and Josh Lebowitz.  We

are scheduled to meet with: Yomi Desalu, Malik Buie, Jamal Noisette, and Sam Walker."

Siegman replied:  "That's great!  You met with some of them before.  There have been a lot of

changes in BET Land.  Hopefully, we can make something work out. Mike."

55.    On June 12, 2017 at 3 p.m. (EST) another meeting was held with BET at 1540

Broadway to discuss "House Party."  After the meeting, BET again was sent the materials about

"House Party" to which they replied that, due to the BET Awards and BET Experience taking

place over the next few weeks, the follow up would need to be scheduled for after July 4th.

56.    On August 14, 2017 (at 10:43 a.m. (EST)), S. Lebowitz e-mailed Desalu, with the

subject "House Party – Follow-Up," stating:  "Seems like FB is integrating many short form

content suggestions we discussed in our last meeting.  Are you available to meet at your offices

on Wednesday, September 6th at 1 p.m. EST to move forward? –Steve."  The e-mail attached a

Financial Times article, titled "Facebook Watch fights for eyeballs from YouTube Social media

group draws publishers into producing viral videos for new platform."

**Defendants Reject "House Party" Yet Again,**
**Ostensibly For Budgetary and Creative Reasons, and**
**Again Refuse To Compensate Walkie Check For Its Work.**

57.     On August 15, 2017 (at 10:17 p.m. (EST)), Desalu replied to S. Lebowitz's

"House Party – Follow-Up" e-mail, stating:

> Greetings Steve, Thank you for your patience with the process, and
> equally as important, thinking of us first.  Unfortunately, we are
> going to pass on the opportunity.  As intriguing as it sounds, we
> simply do not have the numerous resources to engage.

58.     On August 16, 2017 (at 8:49 a.m. (EST)), S. Lebowitz replied to Desalu's "House

Party – Follow-Up" e-mail reply, stating:  "Yomi, Three years of meetings and contracts to get an

email that states you don't have the resources to engage.  Aren't we way beyond that point? –

Steve."

59.     On August 16, 2017 (at 9:39 a.m. (EST)), Desalu replied to S. Lebowitz's "House

Party – Follow-Up" e-mail, stating:

> That's fair Steve, I should be more forthcoming.   We put the
> concept out to gauge on a soft scale, the feasibility of it and what
> we got back touched on many facets.  Financially, we are just not
> in the position to fully execute this.   Based off of our
> conversations, these would range in the 80k per episode
> range, with the hope of doing around 10-12 to allow for the
> franchise to get its legs under it and build awareness.  We don't
> have the 800-1M to do that. From a sales perspective, the response
> has not been great.  Deferring to those that have the experience in
> their respective field, this would not be viable.  Broad research
> around the idea yielded tepid results.  Quite honestly, people were
> not really into the notion of "watching" a party, they were into the
> idea of attending one.  Furthermore they questioned watching one
> on television, (Which granted is a screen like a computer), versus
> watching it on Facebook.  Confidence on the potential around
> ratings was non-existent.  The notion of a voyeuristic party held no

storyline and albeit spontaneous was not compelling. Citing the recently failed attempt with our Viacom cohorts with "Wonderland" a recent example was an indication of viewer's interest (or lack thereof) around a desire to party watch. Indeed, you and the team have been vigilant, I wouldn't expect any less. You believe in your idea, and want to see it through. But rather than continuing to consume valuable time on your end where you could be pitching this to partners that may have the aforementioned resources, we wanted to close this chapter so that you could explore. Thank you for your diligence and sincere apologies for my original response being off putting. Yomi.

60.   Upon receiving the e-mail, S. Lebowitz and J. Lebowitz discussed their frustration. Contrary to Desalu's statement, Walkie Check was actually the one to suggest launching the show, as a daily/nightly, on BET's social channels.

61.   Walkie Check also first suggested the vertical video concept to BET during numerous executive meetings and artist visits for both "House Party" and the "Music Matters" taping that never happened – long before others had even considered it.

62.   Beginning in December of 2015, Walkie Check had invited Defendants' representatives to parties, with interested sponsors in attendance, supporting a unique vertical video, first-person, "House Party" concept.

63.   Walkie Check's concept for "House Party" creatively eliminated the wasted top and side space on the screen to entice advertisers to get on board. Orlando herself was excited by the idea of potentially having a headphone brand surround the vertical video as a title sponsor with one speaker on each side of the programming.

64.   Despite Plaintiff pouring years of justifiable time, effort, and resources into House Party and Defendants' sudden termination of the project, Defendants failed to offer Plaintiff a break fee.

65.   Rather than send an e-mail to Desalu (listing the points referenced in Paragraphs 60-64 *supra*), S. Lebowitz decided to meet with Siegman, with whom the entire "House Party"

project had begun.  As a result, on August 29, 2017 (at 1:00 p.m. (EST)), in an attempt to salvage

the years of hard work, S. Lebowitz met with Siegman at the Il Forno restaurant (located at 709

Eighth Avenue in Manhattan).  They examined each of the points that S. Lebowitz had discussed

with J. Lebowitz on August 16, 2017 after receiving the e-mail from Desalu.  Siegman

apologized for the numerous delays.  Siegman stated that S. Lebowitz and his colleagues are

"true professionals" and tried to explain that BET had been going through many changes, which

further complicated the process.  S. Lebowitz told Siegman that a "break fee seems appropriate

here" for the years of work already completed.  Siegman said that he would look into the "break

fee" and see if he could make something work.

**During the Next Three Years, Walkie Check Continued
to Press Defendants About Launching "House Party."**

66.     On September 28, 2017, BET announced that Orlando had been named EVP,

Head of Programming, which seemed like encouraging news for "House Party."

67.     On October 21, 2017 (at 4:45 p.m. (EST)), S. Lebowitz e-mailed Orlando, stating:

"Hope you are doing well.  Ran into . . . [an artist who Defendants had wanted Walkie Check to

consider for "House Party" and with whom S. Lebowitz had previously discussed the project]

and was reminded of what our show could have been.  Looking forward to catching up with you

soon."

68.     On February 21, 2018 (at 8:01 a.m. and 8:07 a.m. (EST)), S. Lebowitz sent

separate e-mails to Siegman and Orlando, stating:  "We were way ahead with the House Party

project.  How about we meet on Tuesday, February 27th at BET and discuss working together?"

69.     On February 22, 2018 (at 10:51 p.m. (EST)), Siegman replied to S. Lebowitz,

stating:  "We have a new President these days.  Music Programming shows like House Party are

not the focus at this time.  It's more about scripted and unscripted programming.  Trust me, I wish we could do the show.  Mike."

70.     On February 27, 2018 (at 7:18 p.m. (EST)), Orlando replied to S. Lebowitz, stating:  "Hey Steven, I hope all is well.  I am in LA and swamped until after upfronts.  We can regroup in April.  Until then, be well.  Best, Connie."

71.     On March 30, 2018 (at 8:20 a.m. (EST)), S. Lebowitz e-mailed Siegman, stating: "Hey Michael, Hope you have a great holiday weekend and a wonderful spring.  Looking forward to seeing you soon. –Steve."  Siegman replied:  "The show has no movement at this time.  If you have an opportunity to shop the show to another network, you should do that.  Also, thank you for reach out about the concert last week.  BET is not interested in doing a show with the Talent."

72.     Notwithstanding this apparent latest rejection of "House Party," Walkie Check, and BET continued to correspond throughout the rest of 2018, 2019, and the early parts of 2020 about the possibility of moving forward with "House Party."  Indeed, on February 12, 2020 (at 2:46 p.m. (EST)), S. Lebowitz e-mailed Orlando, stating:  "Nice to see BET open the Nasdaq today.  We should bring the band back together to discuss some of our new projects.  Looking forward to your response."  Orlando never replied.

**Defendants Wrongfully Appropriate and Illegally Steal "House Party"**
**and Launch the Show on March 29, 2020 Without Compensation, Credit,**
**or Any Regard Whatsoever to Walkie Check's Rights to the Show It Had**
**Created, Developed, and Pitched to Defendants For Nearly Five Years.**

73.     On March 27, 2020 (at 5:34 p.m. (EST)), S. Lebowitz e-mailed J. Lebowitz and Low, stating:

> Would there ever be a better time than now to release House Party?  With all of these people in quarantine, they would love to see a party in The Greatest City on Earth.   Seems like between the Zoom  conference  calls  and  late  night  talk  show  hosts  doing

Periscope style interviews, everyone is finally catching up to where
we were almost a decade ago.  Stay safe. – Steve.

74.     Unbeknownst to Walkie Check, Defendants already had decided to move forward

with "House Party," albeit without Walkie Check.

75.     Specifically, without any warning, credit, compensation, or regard to Walkie

Check, on March 29, 2020, BET launched "House Party" on BET's Instagram Live and refused

to provide Walkie Check one iota of credit, compensation, or regard with respect to the nearly

five years of work they had put into creating, developing, and pitching the show.

76.     Among the things that make Defendants actions particularly wrongful and

repugnant is that Defendants took no steps to mask their illegal theft of Walkie Check's

intellectual-property and ownership rights over "House Party" upon its launch.  Specifically,

Defendants used the identical name "House Party" as Walkie Check originally had presented to

Defendants.  In addition, Defendants shot, and continue to shoot, the show primarily in a first-

person, portrait (*i.e.*, vertical video), orientation as Walkie Check originally had presented and

pitched to Defendants in July 2015 – long before such an orientation was ever considered by

Defendants for show programming.  Walkie Check had included such name and orientation in

the materials presented to Defendants, including, without limitation, the "House Party" show

format, for which Walkie Check has a registered copyright, that reads:

> SMASH CUT in on our HOSTESS already in conversation on her
> phone in the BATHROOM, FaceTiming/Periscoping to her group
> of followers about where she is and what's going on. . . .  She's
> shooting in selfie-friendly vertical aspect ratio framing.

(A true and correct copy of the copyright registration is attached hereto as Exhibit A.)

77.     As distributed, "House Party" features the look and feel Walkie Check had

outlined in the materials presented and described to Defendants.  "House Party" also features a

similar roster of performers and constituent elements as those presented and described to

Defendants during their nearly five years of discussions with Walkie Check – including some talent represented by the same record labels, managers, and publicists and a similar distribution schedule.  (True and correct copies of screen shots of some of BET's marketing materials for, and images from, "House Party" are attached hereto as Exhibit B.)

78.    Because the show is essentially the same as the project Walkie Check had conceived, designed, and created over the course of five years (and for which the United States Copyright Office registered Walkie Check's copyright interest), music-industry insiders have congratulated Walkie Check on the launch of "House Party," thereby confirming that those within the industry recognize "House Party" as Walkie Check's creation.

79.    Now, lacking any other recourse, after years of hard work and receiving no remuneration from Defendants, Walkie Check is left with no option but to commence this action to recover the considerable value of its work.

### FIRST CAUSE OF ACTION
**(Copyright Infringement 17 USC §§ 106, *et seq*.)**
**(Direct, Contributory, and Vicarious Against all Defendants)**

80.    Plaintiff repeats and realleges each of their allegations contained in Paragraph 1 through and including Paragraph 79, as if fully set forth at length hereafter.

81.    Plaintiff is an owner of the copyright in an original work (*i.e.*, the "House Party" show format) that is fixed in a tangible media of expression.

82.    Effective as of May 26, 2020, Plaintiff registered its treatment of "House Party" with the United States Copyright Office.

83.    Plaintiff is informed and believes, and on that basis alleges, Defendants have produced, reproduced, and prepared derivative works based upon, distributed, publicly performed, and/or publicly displayed Plaintiff's protected work and/or derivatives of Plaintiff's protected work without Plaintiff's consent.

19

84.     Defendants' acts violate Plaintiff's exclusive rights, under the Copyright Act, 17 U.S.C. §§ 106 and 501, including, but not limited to, Plaintiff's exclusive rights to produce, reproduce, and distribute copies of its work, to create derivative works, and to publicly perform and display its work.

85.     Defendants' infringement and substantial contributions to the infringement of Plaintiff's copyrighted work have been done knowingly without Plaintiff's consent for commercial purposes and for Defendants' financial gain.

86.     Defendants failed to exercise their right and ability to supervise persons within their control to prevent such persons from infringing Plaintiff's copyrighted work and did so with the intent to further their financial interest in the infringement of Plaintiff's work.  Accordingly, Defendants have directly, contributorily, and vicariously infringed Plaintiff's copyrighted work.

87.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, together with interest, attorneys' fees and costs of suit, and all other relief allowed under the Copyright Act.

**SECOND CAUSE OF ACTION**
**(Breach of Implied Contract/*Quantum Meruit*)**
**(Against all Defendants)**

88.     Plaintiff repeats and realleges each of their allegations contained in Paragraph 1 through and including Paragraph 87, as if fully set forth at length hereafter.

89.     Plaintiff and Defendants entered into an implied-in-fact contract, based on their conduct as alleged above, and/or provided services to Defendants whereby Plaintiff disclosed ideas and materials for "House Party" to Defendants for sale (*i.e.*, in consideration for Defendants' obligation to pay and credit Plaintiff if Defendants or any of their affiliated entities used any of those ideas or materials in any motion picture, television program, live stream, merchandise, or otherwise).

90.     Plaintiff reasonably expected to be compensated for such use of any of its ideas, materials, and/or services.

91.     Defendants voluntarily accepted Plaintiff's offer and disclosures, knowing the conditions on which they were made (*i.e.*, that any use of Plaintiff's ideas or materials in any motion picture, television program, live stream, merchandise, or otherwise, whether by Defendants or any of their affiliates, carried with it an obligation to, *inter alia*, compensate and credit Plaintiff for such use).

92.     Plaintiff conveyed, and Defendants accepted, Plaintiff's ideas, materials, and/or services for "House Party," with an understanding of the custom and practice in the entertainment industry of providing ideas, materials, and/or services to producers and studios in exchange for compensation and credit if such ideas, materials, and/or services are used.

93.     Defendants' conduct implied, and led Plaintiff reasonably to believe, that Defendants would compensate and credit Plaintiff for its ideas, materials, and/or services for "House Party," if Defendants or any of their affiliates used any of Plaintiff's ideas, materials, and/or services in any motion picture, television program, live stream, merchandise, or otherwise.

94.     Plaintiff has performed all conditions, covenants, and promises required to be performed on its part, in accordance with its implied-in-fact contract with Defendants.

95.     Defendants used Plaintiff's ideas, materials, and/or services in "House Party" and such ideas, materials, and/or services provided substantial value to Defendants.  Nonetheless, Defendants have not compensated or credited Plaintiff for the use of such ideas, materials, and/or services.  Accordingly, Defendants have breached, and continue to breach, their implied-in fact contract with Plaintiff and/or are liable to Plaintiff under principles of *quantum meruit*, if no such implied-in-fact contract exists.

96.     As an actual and proximate result of Defendants' material breaches of the implied-in-fact contract or under principles of *quantum meruit* (if no such implied-in-fact contract exits), Plaintiff has been damaged in an amount to be determined at trial, together with interest, expenses, costs, and attorneys' fees.

**THIRD CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Against all Defendants)**

97.     Plaintiff repeats and realleges each of their allegations contained in Paragraph 1 through and including Paragraph 96, as if fully set forth at length hereafter.

98.     Plaintiff disclosed to Defendants ideas and materials for "House Party."

99.     Defendants used Plaintiff's ideas and materials in "House Party," and such ideas and materials provided substantial value to Defendants.  Nonetheless, Defendants have not compensated or credited Plaintiff for the use of such ideas and materials.

100.     Accordingly, Defendants were enriched at Plaintiff's expense, such that equity and good conscience will not permit Defendants to retain the value of the ideas and materials that they unlawfully took from Plaintiff.

101.     As an actual and proximate result of Defendants' unjust enrichment, Plaintiff has been damaged in an amount to be determined at trial, together with interest, expenses, costs, and attorneys' fees.

***   ***   ***

**WHEREFORE**, Plaintiff Walkie Check Productions, LLC respectfully requests the Court enter judgment on the Complaint:

(i)     On Plaintiff's first cause of action for copyright infringement 17

USC §§ 106, *et seq.*, awarding money damages to Plaintiff and

against Defendants in an amount to be determined at trial, together

with interest, expenses, costs, and attorneys' fees;

(ii)   On Plaintiff's second cause of action for breach of implied

contract/*quantum meruit*, awarding monetary damages to Plaintiff

and against Defendants in an amount to be determined at trial,

together with interest, expenses, costs, and attorneys' fees;

(iii)  On Plaintiff's third cause of action for unjust enrichment, awarding

monetary damages to Plaintiff and against Defendants in an

amount to be determined at trial, together with interest, expenses,

costs, and attorneys' fees; and

(iv)   Awarding such other relief as the Court deems just and proper.


Dated: New York, New York
        February 10, 2021

**ALDOUS PLLC**

_____
Kenneth E. Aldous (KA-9526)

555 Fifth Avenue, 17th Floor
New York, New York 10017
(212) 856-7281 (tel)
(646) 603-9363 (fax)
kaldous@aldouspllc.com

*Attorneys for Plaintiff*
*Walkie Check Productions, LLC*