

**WOOK HWANG**
Partner

345 Park Avenue
New York, NY  10154

**Direct**   212.407.4035
**Main**    212.407.4000
**Fax**      212.937.3847
whwang@loeb.com

Via ECF and E-mail
(Failla_NYSDChambers@nysd.uscourts.gov)

April 19, 2021

Hon. Katherine Polk Failla
United States District Court
40 Foley Square, Room 2103
New York, New York 10007

Re:   *Walkie Check Productions, LLC v. Viacom CBS Inc. et al.*, Case No. 1:21-cv-01214-KPF

Dear Judge Failla:

We represent Defendants ViacomCBS Inc., Black Entertainment Television LLC and BET Productions IV, LLC (collectively, "Defendants") in the above action.  Pursuant to Rule 4(A) of Your Honor's Individual Practices, we write to request a pre-motion conference in advance of Defendants' anticipated motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Complaint of Plaintiff Walkie Check Productions, LLC ("Plaintiff").  Plaintiff does not consent to this motion.

**BACKGROUND**

Plaintiff and non-party TAD2000, Inc. d/b/a Spin The Bottle ("STB") are the alleged creators and copyright co-owners of an unscripted series concept called "House Party."  This action arises out of the parties' failed negotiations in 2015 and 2016 to bring this series to BET, and Defendants' subsequent release in 2020 of their own series titled "House Party" on BET's social media.[1]

As alleged in the complaint, STB and Plaintiff submitted their series proposal to Defendants by email on September 30, 2015 (Cmplt. ¶ 19), describing a concept where each episode would depict a hostess, partygoers, musical performers and celebrity guests gathered in a Manhattan brownstone—quite literally, a "house party" with live music.  Plaintiff later registered a written treatment for this concept with the U.S. Copyright Office.  (*Id.*, Ex. A).  Plaintiff's registered deposit copy is attached hereto as Exhibit 1 (the "Treatment").

The subsequent correspondence is laid out in detail in the Complaint (at ¶¶ 19-72).  Draft agreements were exchanged.  (*Id.* ¶¶ 34-40).  Plaintiff ultimately "rejected [Defendants'] demands" over various material terms (*id.* ¶ 40), and Defendants thus advised Plaintiff and STB in July 2016 that Defendants "have decided not to move forward with the 'House Party' project."  (*Id.* ¶ 41).  The correspondence continued, with Plaintiff seeking compensation, among other things, for having "spent money on contract negotiations" (*id.* ¶ 44), to which Defendants replied that they had "tried to get this done" but "couldn't get it done" despite the "months of negotiation" (*id.* ¶ 45).  Defendants thereafter continued to advise Plaintiff that they were "going to pass on the opportunity."  (*Id.* ¶ 57).

---

[1] While there are no allegations asserted against ViacomCBS Inc. (a separate basis for dismissal), all Defendants are referred to collectively for simplicity.

Los Angeles   New York   Chicago   Nashville   Washington, DC   San Francisco   Beijing   Hong Kong   www.loeb.com

For the United States offices, a limited liability partnership including professional corporations. For Hong Kong office, a limited liability partnership.

20608364



In March 2020, years after these failed negotiations, the BET "House Party" series (the "BET Series") was launched on Instagram Live (*id.* ¶ 75), and subsequently disseminated also on Facebook Live. The first recorded episode is available on Facebook at https://fb.watch/4ULGqNxrEQ/, and all recorded episodes will be submitted on Defendants' anticipated motion.[2]  As these materials show, the concept for the BET Series is not at all similar to Plaintiff's series concept, and does not depict an actual "house party" or anything like a "house party."  Rather, launched at the outset of the coronavirus pandemic, it is intended to bring the *proverbial* "party" through social media to the audience's "house," with episodes ranging from guest discussions on COVID-19, mental health, race, politics, and business advice, to virtual classes for exercise, cooking and tap dancing.  While a few of the episodes feature musical performances, there is no actual "party" in these episodes either.  And there is no consistency in the run-times, format, or content.

Based on the parties' failed negotiations and Defendants' launch of the BET Series years later, Plaintiff asserts claims for copyright infringement, as well as state law claims for breach of implied-in-fact contract, quantum meruit and unjust enrichment.

**GROUNDS FOR DISMISSAL**

**A.     Plaintiff's Claim for Copyright Infringement Fails as a Matter of Law**

A copyright plaintiff must establish, *inter alia*, that "substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work."  *Abdin v. CBS Broad., Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (citation and punctuation omitted).  Second Circuit law is clear that copyright claims should be dismissed, at the pleading stage, where "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work...."  *Peter F. Gaito*, 602 F.3d at 63-64 (citation omitted).

Here, as a review of the works will show, the purported "similarities" begin and end with elements that are unprotectible as a matter of law.  Among other things, the common title "House Party"—used in numerous past works[3]—is unprotectible because "the title of a work cannot form the basis for a copyright infringement claim."  *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 569 (S.D.N.Y. 2009); *see also, e.g.,* U.S. Copyright Office, Compendium Of U.S. Copyright Office Practices § 313.4(C) (3d ed. 2014) ("Words and short phrases, such as names, titles, and slogans, are not copyrightable because they contain a *de minimis* amount of authorship.").  Similarly, the "first-person, portrait (i.e. vertical video), orientation" (Cmplt. ¶ 76)—used in only some episodes of the BET Series—is hardly original to Plaintiff, as a review of "selfie" videos posted on any social media platform shows.  *See, e.g., Fulks v. Knowles-Carter*, 207 F. Supp. 3d 274, 281 (S.D.N.Y. 2016) (granting motion to dismiss copyright claim based, *inter alia*, on "similarities in orientation and camera angle").  The only other "similarities" Plaintiff alleges are that the BET Series includes "some talent

---

[2] On motions to dismiss a copyright claim, "the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings."  *Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citations and quotation marks omitted).  And "[i]t is well established that courts may take judicial notice of the works at issue in a copyright case" on Rule 12 motions.  *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 298 (S.D.N.Y. 2012).

[3] For example, the IMDB database identifies 63 works with the title "House Party."  *See* https://www.imdb.com/find?q=house%20party&s=tt&exact=true&ref_=fn_al_tt_ex).


Hon. Katherine Polk Failla
April 19, 2021
Page 3

represented by the same record labels, managers, and publicists and a similar distribution schedule." (Cmplt. ¶ 77).  Plaintiff has no copyright monopoly over these either.[4]

After extracting these generic and unprotectible elements from the analysis, the BET Series and Plaintiff's Treatment are entirely *dis*similar in their protectible expression, such that Plaintiff's copyright claim fails as a matter of law.  *See, e.g., Abdin*, 971 F.3d at 73 (affirming dismissal because, "after extracting the unprotectible elements from [plaintiff's work], ... [the parties' works] are not substantially similar because the protectible elements ... are markedly different").

**B.     Plaintiff's Claim for Breach of Implied-In-Fact Contract Fails as a Matter of Law**

Plaintiff's implied contract claim fails for several reasons, including that the allegations themselves establish that there was no mutual assent, and therefore no contract.  As with any contract, "[a]n implied-in-fact contract requires such elements as consideration [and] mutual assent."  *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 359 (S.D.N.Y. 2012).  And "a contract cannot be implied in fact where the facts are inconsistent with its existence."  *LPD N.Y., LLC v. Adidas Am., Inc.*, 2016 U.S. Dist. LEXIS 115021, at *32 (E.D.N.Y. Aug. 25, 2016).  Here, Plaintiff's own allegations show that the parties merely exchanged *draft* agreements, with significant *dis*agreement on material terms concerning the ownership of the series, the lack of a break-up fee, and profit sharing.  (Cmplt. ¶¶ 37-39).  Based on these disagreements, Plaintiff was the one who "rejected [Defendants'] demands" (*id.* ¶ 40), leading Defendants to decide "not to move forward" with the project.  (*Id.* ¶ 41).  Under these circumstances, there was no implied-in-fact contract.[5]

**C.     Plaintiff's Claims for Quantum Meruit and Unjust Enrichment Fail as a Matter of Law**

These claims are barred, among other reasons, because each of them is preempted by the Copyright Act.  *See, e.g., Einiger v. Citigroup, Inc.*, 2014 U.S. Dist. LEXIS 128180, at *22-23 (S.D.N.Y. Sep. 11, 2014) ("[U]njust enrichment and quantum meruit claims are *sua sponte* dismissed with prejudice on the ground that they are completely preempted by the Copyright Act").

Defendants respectfully request a pre-motion conference to address their anticipated motion to dismiss based on the foregoing.  We thank the Court for its attention to this matter.

---

[4] *See, e.g., Alexander v. Murdoch*, 2011 U.S. Dist. LEXIS 79543, at *34 (S.D.N.Y. May 27, 2011) (rejecting as "clearly nonsensical" plaintiff's contention that copyright claim was supported because characters in both works "were designed to be played by the actress Sofia Vergara"); *Torah Soft Ltd. v. Drosnin*, 136 F. Supp. 2d 276, 284-86 (S.D.N.Y. 2001) ("In no case does copyright protection ... extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.").

[5] *See, e.g., LPD N.Y.*, 2016 U.S. Dist. LEXIS 115021, at *34, 39 n.15 (claim for "implied-in-fact contract fails for the same reason that an express contract fails: the parties did not show their unambiguous mutual assent to the material terms of the agreement by word or deed," including on such terms as "profit sharing, royalties, intellectual property rights"); *Vioni v. Am. Capital Strategies Ltd.*, 2009 U.S. Dist. LEXIS 4664, at *12-13 (S.D.N.Y. Jan. 23, 2009) ("At best, these e-mails demonstrate that Vioni and Defendants were in the midst of negotiations that might eventually have led to a meeting of the minds on the issue of how Vioni was to be compensated" and "do not set forth the essential terms of an agreement."); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 359 (S.D.N.Y. 2012) ("Because the Court concludes above that the Parties intended to be bound only by a formal, executed written agreement, it finds that Plaintiff has not adequately alleged the existence of an implied-in-fact contract.").



Hon. Katherine Polk Failla
April 19, 2021
Page 4

Respectfully submitted,

*/s/ Wook Hwang*

Wook Hwang
Partner

Attachment

cc:     Plaintiff's counsel (via ECF)

# EXHIBIT 1



LIBRARY OF CONGRESS

*Copyright Office of the United States*

WASHINGTON, D.C.

**THIS IS TO CERTIFY** that the attached color photocopies are a true representation of the work entitled **HOUSE PARTY** deposited in the Copyright Office with claim of copyright registered under number **PAu 4-026-028**.

**THIS IS TO CERTIFY ALSO**, that due to the nature of the work deposited, the attached photocopies are the best possible electrostatic positive prints available.

**THIS IS TO CERTIFY FURTHER**, that deposits submitted electronically bear no identifying marks.

**IN WITNESS WHEREOF,** the seal of this Office is affixed hereto on March 23, 2021.

Shira Perlmutter
United States Register of Copyrights and Director

By: Jarletta Walls
Section Head
Records Research and Certification Section
Office of Public Records and Repositories

Use of this material is governed by the U.S. copyright law 17 U.S.C. 101 et seq.



## FORMAT
**TRT: 20:30:00**

### A1. COLD OPEN – HOSTESS IN BATHROOM                                00:20
SMASH CUT in on our HOSTESS already in conversation on her phone in the BATHROOM, FaceTiming/Periscoping to her group of followers about where she is and what's going on. We, as the TV audience, have arrived late. The party and her private broadcast are already in progress. She's shooting in selfie-friendly vertical aspect ratio framing. We hear the sounds of a band playing and a raucous party already underway just outside the BATHROOM door as she fixes her hair and make-up in the mirror.

### A2. TITLE SEQUENCE                                                 00:15
A DRONE hovering outside and above the 1870s-era brownstone captures the Empire State Building in all its majestic glory. The DRONE floats down from the ESB and hovers outside the loft-style windows of the brownstone, peeking in on the party inside as the "House Party" logo animates and logos of our two lead sponsors appear over the shot. Dissolve to cocktail napkins with the names of tonight's TWO MUSICAL ARTISTS and special CELEBRITY GUESTS written in (sometimes smudged) girlish handwriting and shot as if through a smartphone.

### A3. HOSTESS – INSIDE THE BATHROOM                                  00:20
Our HOSTESS, back in the BATHROOM, tells her Periscope audience that she wants to show them around.

### A4. HOSTESS TOURS THE PREMISES                                     00:50
She exits the BATHROOM and we see a line of other attractive, fashion-forward PARTYGOERS waiting to use it. The music, coming from a live performer (ARTIST #1) in a nearby room, fills the room as she holds her phone aloft so we can watch as she navigates her way through an off-the-hook party already in progress. Overhead SECURITY CAMERAS capture her progress as she moves through the rooms. On her phone, we see her pass a few familiar faces – CELEBRITY GUESTS in conversation. Pop-up text bubbles point out who's who. A friend approaches and tells her that ARTIST #1 is finishing his set. They both rush back to the stage…

### A5. ARTIST #1 PERFORMS                                              2:30
As soon they enter the STAGE AREA, the video feed switches from our HOSTESS'S "phone's" vertical-aspect ratio framing to the more traditional horizontal-aspect ratio, shot by multiple tripod-mounted and handheld HD cameras. We see ARTIST #1 in mid-song, crowd members pumping their fists and going crazy. Occasionally, we cut back to

our HOSTESS'S "Phone" video, but she's further back in the crowd. Her view is partially obscured through a foreground of hands, hair and cocktail glasses.

On-screen graphics encourage the home audience to go to BET.com for additional songs by ARTIST #1.

### A6. HOSTESS & ARTIST #1 CHAT, POST-SONG                                00:50
ARTIST #1 finishes his song and the crowd goes crazy. Our HOSTESS winds her way through the BEAUTIFUL PARTY GUESTS to reach the STAGE where she and ARTIST #1 engage in friendly flirty party chat while other PARTY GUESTS occasionally interrupt to congratulate ARTIST #1 on his show. We eavesdrop on a BEAUTIFUL PARTY GUEST or a CELEBRITY GUEST praising ARTIST #1 (with pop-up bubbles describing who's who) when someone tells our HOSTESS that ARTIST #2 is about to arrive.

### A7. HOSTESS HEADS TOWARD FRONT WINDOW                                00:30
Our HOSTESS departs the STAGE AREA. Whether we return to following her through her phone's video and through SECURITY CAMERA video. She passes a throng of sexy party guests, including a CELEBRITY GUEST or two, stopping briefly for a quick interchange or to eavesdrop on an already-existing conversation (about ARTIST #1's performance, Trump's latest antics, a celebrity breakup, etc.)

### A8. HOSTESS LOOKS OUT THE WINDOW                                      00:20
Our hostess makes it to the front of the party space – the LOUNGE - where windows look out onto the Ace Hotel and a vibrant street scene full of NYC yellow taxis, pedicab cyclists, street vendors and sirens. From her third-floor vantage, she opens the window and peers down onto the street where she sees ARTIST #2 and his entourage crossing West 29th Street toward the brownstone. She shouts out a greeting and they look up surprised, then smile and wave. The buzzer buzzes...and she runs to buzz them in. She talks to fellow PARTY GUESTS about how excited she is to see ARTIST #2....when all of a sudden, in somebody's mid-sentence, the feed cuts off abruptly...

### A9. BUMPER OUT                                                        00:05
...and we see the shot from DRONE, hovering outside the window of the party. It ascends to view the Empire State Building and we cut to break.

### - COMMERCIAL BREAK -

### B1. BUMP IN                                                           00:05
Our DRONE descends from its view of the ESB and hovers outside the loft windows, watching the people, lights and revelry. The animated logo plays to the sounds of the ongoing party.

### B2. HOSTESS IN ELEVATOR WITH ARTIST #2                                00:30
We catch our HOSTESS mid-conversation in the ELEVATOR with ARTIST #2 and his ENTOURAGE, ascending up to the 3rd Floor. They chat casually about how the party he's about to encounter – all shot selfie-style with her "phone." Pop-up graphic factoids deliver facts about ARTIST #2's career, his latest project, his album release date, etc.

### B3. ARTIST #2 HEADS TO THE STAGE                              00:30

Opening the door to the party, the noise and energy dramatically swell.  ARTIST #2 wends his way through the crowd of well-wishers, pausing briefly for a quick interchange with a guest (upon which we eavesdrop, learning more via pop-up factoids) – until he enters the STAGE AREA.  Suddenly the camera switches from single-camera vertically-oriented selfie framing to HD multi-cam horizontal framing, capturing the full-blown energy inside the intimate room.

### B4. ARTIST #2 PERFORMS                                         02:50

The crowd goes crazy for a performance in such close quarters.  An enthusiastic group of fans mingles with the ARTIST'S ENTOURAGE, singing along to the chorus – all inches away from ARTIST #2 who can't help but infectiously react.  Mid-song, we cut to our HOSTESS'S camera which reveals what's happening around the room while ARTIST #2 performs: tequila shots being thrown back at the bar, a couple grinding in the corner, a boyfriend's hand finding his girlfriend's back pocket. The song ends and the crowd cheers.

### B5. ARTIST #2 & CELEBRITY GUEST CHAT WITH HOSTESS AT BAR   00:30

Our HOSTESS lures ARTIST #2 over to the BAR for a between-song beverage.  CELEBRITY GUEST #1 is already positioned at the BAR so there's room for loose unscripted banter between ARTIST #2, amped-up PARTY GUESTS and the CELEBRITY GUEST.

### B6. ARTIST #2 – A SECOND PERFORMANCE                          00:30

After a brief chat, our HOSTESS encourages ARTIST #2 to return to the STAGE.  As he begins to play, we abruptly CUT OUT…

### B7. BUMPER OUT                                                 00:05

…to video from the DRONE, hovering outside the window.  We hear ARTIST #2 continuing his song as we cut to break.


### - COMMERCIAL BREAK -


### C1. BUMP IN                                                    00:05

Our DRONE, still hovering outside the window, picks up the last bits of ARTIST #2's second performance and the eruption of cheering from the crowd.

### C2. HOSTESS BACK IN BATHROOM                                   00:10

Our HOSTESS is back in the BATHROOM – for a brief respite from the party – to recap what's been going on, who's at the party and what she thinks might happen next.  She decides to go in search of CELEBRITY GUEST #2 who she heard was at the party.

### C3.  HOSTESS LOOKS FOR CELEBRITY GUEST #2                      00:50

We watch as she snakes her way through the crowd, her progress occasionally monitored by SECURITY CAMERA footage.  She's still shooting herself FaceTime/Periscope-style – capturing her face and the various party guests in the same

shot. She finds CELEBRITY GUEST #2 in the LOUNGE, about to play a game of Spin The Bottle around a large (branded?) lit-up bottle. She watches a round to see what kind of kiss gets delivered then hones in for a few off-the-cuff questions about his/her career, upcoming projects and thoughts on ARTIST #2's performances so far.

### C4. BUZZER BUZZES WITH FOOD DELIVERY                              00:30
The buzzer buzzes and our HOSTESS buzzes them in, jokingly asking CELEBRITY GUEST #2 if he/she has money to pay for the snacks. They both go to answer the door, only to find a CELEBRITY GUEST #3 at the door carrying a (branded?) delivery of take-out food for the party.

### C5. PASS OUT THE FOOD AS ARTIST #2 BEGINS 3rd PERFORMANCE    00:20
Our HOSTESS and the just-arrived CELEBRITY GUEST #3 wend their way through the party with the food held high overhead, passing out snacks as they go. The sound of ARTIST #2 beginning a new song lures them toward the STAGE AREA. Again, as they pass through, the video feed switches from her shaky selfie angle to a pristine, steady HD footage. They arrive late and are stuck behind heads and dancing bodies.

### C6. ARTIST #2 PERFORMS 3rd SONG                                    02:30
The home audience watches the remainder of ARTIST #2's 3rd performance. On-screen graphics encourage the home audience to go to BET.com for additional songs by ARTIST #2. As he finishes and the crowd erupts in cheers, we see ARTIST #2 encouraging CELEBRITY GUESTS #1, #2, & #3 and other PARTY GUESTS to join him on stage. The crowd starts to chant and clap with encouragement. We cut to our HOSTESS CAMERA where she excitedly confronts one of the CELEBRITY GUESTS about whether he'll join the stage. As the CELEBRITY GUEST is answering, the video cuts to...

### C7. BUMP OUT                                                         00:05
...the DRONE, **hovering outside the window**. We hear the CELEBRITY GUEST chatting as we cut to break.

- **COMMERCIAL BREAK –**

### D1. BUMP IN                                                         00:05
Our DRONE, still hovering outside the window, sees that the venue is packed to capacity.

### D2. HOSTESS IN BATHROOM WITH CELEBRITY GUEST #3              01:00
Our HOSTESS has lured one of the CELEBRITY GUESTS to join her in the BATHROOM – where it's relatively quieter. They chat about how insane the party is and what's happening now. Pop-up graphic factoids reveal information about CELEBRITY #3's movie that's opening this weekend. The HOSTESS wants to know whether CELEBRITY GUEST #3 will join the JAM SESSION. A PARTY GUEST knocks on the BATHROOM door and joins the discussion, bringing some of the just-delivered snacks inside.

### D3. JAM SESSION – ALREADY IN PROGRESS – FINAL PERFORMANCE  02:25

Our HOSTESS, CELEBRITY GUEST #3 and a PARTY GUEST depart the BATHROOM and head toward the sound of a song underway. As they enter the STAGE AREA, the video switches to HD horizontal and we see ARTIST #2 on-stage with ARTIST #1 along with CELEBRITY GUESTS #1 & #2 and other PARTY GUESTS, all taking a verse or singing back-up vocals on a chorus.  The crowd fist pumps to the spontaneity on display, cheering when each new performer takes the mic.

### D4. HOSTESS IN THE AUDIENCE                                           01:00

Amidst this madness, we cut to our HOSTESS'S phone video, with her excitement plainly visible in her face. She narrates what's happening to her off-screen audience as a peep-show-style black "window shade" begins slowly descending over the screen, signaling that the end is near. Credits appear on the "window shade" including a web address for additional "Pay-Per-View" viewing. When the "window shade" reaches the bottom of the screen, we cut to black. The party continues, but our "House Party" invitation has expired for now.