UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WALKIE CHECK PRODUCTIONS, LLC,

                            Plaintiff,

                -v.-

VIACOMCBS INC., BLACK ENTERTAINMENT
TELEVISION LLC *d/b/a BET Networks*, and
BET PRODUCTIONS IV, LLC,

                            Defendants.

---

21 Civ. 1214 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:[1]

        Plaintiff Walkie Check Productions, LLC ("Walkie Check") is the owner of

a registered copyright in a treatment for a show entitled "House Party."  In

2015, Plaintiff pitched the idea for House Party to several media executives

affiliated with Defendants ViacomCBS Inc. ("Viacom"), Black Entertainment

Television LLC d/b/a BET Networks ("BET"), and BET Productions IV, LLC

("BET IV," and together with Viacom and BET, "Defendants") in the hopes of

negotiating a deal to launch the show on the BET network.  Despite years of

serious negotiations, the parties did not reach a deal and Plaintiff's "House

Party" never appeared on BET.  In early 2020, much to Plaintiff's chagrin,

Defendants launched their own "House Party" series on BET, which Plaintiff

contends is virtually identical to their copyrighted work.  For this conduct,

---

[1]        Sarika Bhattacharjee, a rising second-year student at Columbia Law School and an
        intern in my Chambers, provided substantial assistance in researching and drafting
        this Opinion.

Plaintiff asserts claims for copyright infringement, breach of implied contract, and unjust enrichment.

Defendants now move to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated in the remainder of this Opinion, the Court grants in part and denies in part Defendants' motion.

**BACKGROUND**[2]

**A.    Factual Background**

**1.    The Parties**

Walkie Check is a limited liability company organized and principally based in New York. (Compl. ¶ 5). Defendants are three affiliated media and entertainment companies. (*Id.* at ¶¶ 6-8). Viacom, a Delaware corporation with its principal place of business in New York, sits at the top of the corporate structure and holds a controlling interest in BET and BET IV. (*Id.* at ¶ 6). BET is a limited liability company, organized in the District of Columbia and with its principal place of business in New York. (*Id.* at ¶ 7). BET is a subsidiary of Viacom that provides entertainment, music, news, and public-affairs television

---

[2]    This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true on this motion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Wook Hwang ("Hwang Decl., Ex. [ ]" (Dkt. #59)) and the Declaration of Steven Lebowitz ("Lebowitz Decl., Ex. [ ]" (Dkt. #65)). Among these exhibits is a copy of Plaintiff's copyrighted work (Hwang Decl., Ex. B ("Treatment")), and materials comprising Defendants' allegedly infringing work (*id.*, Ex. C, D), all of which the Court may consider on this motion. *See Effie Film, LLC* v. *Pomerance*, 909 F. Supp. 2d 273, 298 (S.D.N.Y. 2012) ("It is well established that courts may take judicial notice of the works at issue in a copyright case.").

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #58); Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #64); and Defendants' reply memorandum of law as "Def. Reply" (Dkt. #70).

2

programming.  (*Id.*).  BET IV is a subsidiary of BET and a limited liability company that is organized in Delaware and principally based in New York.  (*Id.* at ¶ 8).

### 2.    The Copyrighted Work: Plaintiff's "House Party"

The copyrighted work at issue in this case is Plaintiff's Treatment for a show called House Party.  (Treatment).  Plaintiff registered the Treatment with the United States Copyright Office on May 26, 2020.  (Compl. ¶ 82).

The Treatment provides a detailed description of the format for a show centered on a "raucous" house party at a Manhattan brownstone, replete with crowds of partygoers, celebrity guests, and musical performances.  (Treatment ¶¶ A1, A4, D1, D2, D4).  The show opens in the midst of the party, portrayed through the lens of a hostess live-streaming the scene on her smartphone.  (*Id.* at ¶ A1).  At various points, the viewer's perspective toggles between the hostess's "shooting in selfie-friendly vertical aspect ratio framing," and a more traditional horizontal-aspect ratio sourced from tripod-mounted cameras throughout the brownstone.  (*Id.* at ¶¶ A1, A5).  The viewer follows the hostess as she weaves through different areas of the brownstone, filming musical performances, chatting with musical artists, and having unscripted interactions with celebrity guests.  (*Id.* at ¶¶ A4, B2-B6).  The Treatment describes the brownstone as "packed to capacity," with an "off-the-hook" and "insane" atmosphere.  (*Id.* at ¶¶ A4, D1, D2).  The 20-minute episode ends with a black window shade slowly descending on the screen, which eventually cuts to black.  (*Id.* at ¶ D4).

###### 3.     The Parties' Negotiations over House Party

Plaintiff introduced the House Party concept to Defendants on July 8, 2015, when Walkie Check CEO Joshua Lebowitz, Steven Lebowitz,[3] and Tad Low, proprietor of the separate company Tad2000, Inc. d/b/a Spin the Bottle ("STB"), met with BET representative Michael Siegman. (Compl. ¶ 13). At this meeting, Plaintiff and STB pitched Siegman on the House Party show, which they expected to film at a Manhattan brownstone owned by STB. (*Id.*). Throughout the summer of 2015, Plaintiff and Defendants continued to explore the House Party concept by organizing meetings, conference calls, and guided tours of the brownstone. (*Id.* at ¶¶ 15-18). Siegman and Constance "Connie" Orlando, BET's then-Senior Vice President of Specials, Music, and News, were two of Plaintiff's primary contacts throughout the House Party negotiations. (*See, e.g.*, *id.* at ¶¶ 15, 17-18).

On September 30, 2015, Plaintiff sent Defendants the production materials for 12 episodes of House Party, which materials included a "One Sheet" and the Treatment for the show. (Compl. ¶ 19; Hwang Decl., Ex. A ("One Sheet"); Treatment).[4] After receiving these materials, Defendants continued to engage Plaintiff on developing House Party and took steps to schedule a live-stream musical performance at the brownstone. (Compl. ¶¶ 19-

---

[3]     References in this Opinion to "Lebowitz" are to Steven Lebowitz unless otherwise indicated.

[4]     As its description suggests, the One Sheet contains a one-page description of the House Party concept, which is advertised as a "new documentary series capturing the spontaneous action inside a real 19th-century brownstone under the Empire State Building in the heart of Manhattan." (One Sheet). Plaintiff did not register the One Sheet with the United States Copyright Office.

20). The parties' negotiations largely stalled throughout the fall of 2015 and into 2016, because Defendants repeatedly postponed the contemplated live-stream event at the brownstone. (*Id.* at ¶¶ 21-28). Finally, on March 23, 2016, Defendants met with Plaintiff to apologize for the delays, and reiterated their determination to bring House Party to fruition with BET. (*Id.* at ¶ 29). Following this meeting, in April and May 2016, the parties worked on a revised budget proposal and Defendants received another walk-through of the brownstone. (*Id.* at ¶¶ 30-33).

On May 5, 2016, Defendants sent Plaintiff a draft agreement for the House Party project. (Compl. ¶ 34). After marking up the agreement and exchanging drafts, Plaintiff remained concerned about several issues, including Defendants' ownership of the House Party concept; Defendants' ability to take House Party elsewhere without Plaintiff's involvement; the omission of a termination or "break" fee for House Party, despite being engaged in negotiations for nearly a year; and Defendants' failure to include profit-sharing from sponsorships. (*Id.* at ¶ 37). Plaintiff took particular issue with the portions of the draft agreement that purported to transfer to BET IV all elements created, or to be created at any time, in connection with House Party and that established Defendants as the author and exclusive owner of all interest in the House Party materials. (*Id.* at ¶¶ 38-39).

The parties continued to negotiate for the next several weeks, until July 8, 2016, when Siegman emailed Plaintiff to say that Defendants had decided not to move forward with House Party. (Compl. ¶ 41). Approximately

two weeks later, Orlando emailed Lebowitz acknowledging Plaintiff's frustration that the efforts it had expended had not yielded success, while observing that "we ALL tried to get this done (your side and ours) but unfortunately we couldn't get it done in the right time frame." (*Id.* at ¶ 45).

On August 16, 2016, Lebowitz again reached out to Siegman in an attempt to reconnect on House Party. (Compl. ¶ 46). For the next year or so, Lebowitz continued to email Siegman, Orlando, and other of Defendants' representatives about reviving the show. (*Id.* at ¶¶ 47-56). Finally, on August 15, 2017, Lebowitz received an email from Yomi Desalu of BET's Music Programming and Specials team, informing him that Defendants were "going to pass on the opportunity." (*Id.* at ¶ 57). In this email, Desalu cited a lack of "resources to engage" as the reason for Defendants' disinterest in continuing negotiations over House Party. (*Id.*). The next day, Desalu sent a follow-up email to Lebowitz, explaining that Defendants "wanted to close this chapter so that [Plaintiff] could explore" the House Party idea with others. (*Id.* at ¶ 59).

In the fall of 2017, Lebowitz again sought to rekindle the House Party negotiations by emailing Orlando, who had just been named BET's Executive Vice President, Head of Programming. (Compl. ¶¶ 66-67). Thereafter, Lebowitz continued to send emails to Siegman and Orlando, but failed to gain much traction. (*Id.* at ¶¶ 68-71). On March 30, 2018, Siegman shut down this latest round of House Party talks with an email to Lebowitz that said "[t]he show has no movement at this time. If you have an opportunity to shop the show to another network, you should do that." (*Id.* at ¶ 71). Notwithstanding this

rejection, the parties continued to correspond about House Party throughout 2018, 2019, and into the early parts of 2020.  (*Id.* at ¶ 72).

### 4.    The Allegedly Infringing Work: BET's "House Party"

On March 29, 2020, Defendants launched House Party on BET's Instagram Live.  (Compl. ¶ 75).  Plaintiff asserts that the release of this series reflected Defendants' decision to move forward with the House Party concept without crediting or involving Plaintiff in any way.  (*Id.* at ¶¶ 74-75).  For their part, Defendants contend that the House Party series is based on an entirely different — and much broader — concept than that over which they had been negotiating with Plaintiff for the previous five years.[5]

Defendants advertise BET's "House Party IG Live series" in their promotional materials as "featur[ing] daily programming designed to inspire, entertain[,] and empower our community."  (Hwang Decl., Ex. D at 1).  The series involved an array of guests and forms of entertainment, which ranged "[f]rom musical performances and DJ sets to master classes and lifestyle hacks[.]"  (*Id.*).  To illustrate the thematic breadth of the series, the first episode centered on Christian gospel music (*id.* at 1 (Kirk Franklin, Mar. 29, 2020)),

---

[5]    In presenting their allegedly infringing work, Defendants have submitted a DVD that contains 25 individual files, comprising all of the recorded episodes of BET's House Party.  (Hwang Decl., Ex. C).  Defendants have also included all available promotional flyers for episodes of BET's House Party.  (*Id.*, Ex. D).  There are flyers for some, but not all, of the recorded episodes.  There are also flyers for episodes for which a recording does not exist.  The Court's description of Defendants' work is derived from its review of these materials.

For consistency's sake, the Court cites to recordings or flyers that correspond to specific episodes of BET's House Party using the following convention: ([Guest Name], [Episode Date]).

while subsequent episodes featured, among other things, chefs baking in their home kitchen (*id.*, Ex. C (Southern Girl Desserts, Apr. 15, 2020)); a six-minute tutorial for a viral TikTok dance (*id.*, Ex. C (Queen Keke, May 5, 2020)); a board-certified doctor who worked in New York during the COVID-19 pandemic (*id.*, Ex. D at 3 (Dr. Alexea Gaffney, Mar. 31, 2020)); the founders of a men's collective discussing mental health topics (*id.*, Ex. C (Mastermind Connect, June 1, 2020)); and various "happy hours" with DJs (*see, e.g.*, *id.*, Ex. D at 9 (DJ Kiss, Apr. 10, 2020); *id.* at 22 (DJ R-Tistic, May 1, 2020); *id.* at 25 (DJ Tendaji Lathan, May 15, 2020)).

Just as the themes of the episodes vary, so too do their tone, duration, and format.  For instance, a subset of episodes is called "Real Talk," which comprises unscripted conversations with guest speakers and celebrities, covering topics that span from contemporary political issues to stress-coping strategies during the pandemic.  (*See, e.g.*, Hwang Decl., Ex. D at 30 (Kailee Scales & Deepak Chopra, May 29, 2020); *id.* at 42 (DeRay McKesson & Rodney Rikai, Oct. 22, 2020)).  Another group of episodes is introduced as "living room fitness" and involves personal trainers or yoga instructors filming virtual fitness classes.  (*See, e.g.*, *id.*, Ex. D at 33 (Claudine Cooper, July 13, 2020); *id.*, Ex. C (Phyllis Frempong, July 28, 2020)).  Yet another batch of episodes is called "Couchside Concerts," which entails a sort of virtual listening party with live performances by musical artists.  (*See, e.g.*, *id.*, Ex. C (Adé, June 8, 2020); *id.*, Ex. D at 40 (Sebastian Mikael, Sept. 4, 2020)).  Across all of these genres of episodes, certain featured guests uploaded a video in a "selfie-style," vertical

aspect ratio, while others are filmed in a more traditional horizontal aspect ratio. (*Compare, e.g.*, *id.*, Ex. C (SAMMIE, Aug. 12, 2020) (musical artist, selfie-style video), *with, e.g.*, *id.* (Dave Anderson, Aug. 24, 2020) (business analyst, horizontal aspect ratio)).

Defendants explain that episodes of BET's House Party were live-streamed on Instagram Live and subsequently distributed on Facebook, where only some of them were recorded. (Def. Br. 6). According to Plaintiff's tally, there were at least 86 live-streamed episodes of BET's House Party. (*See* Lebowitz Decl., Ex. 3). The final episode of BET's House Party was streamed on January 20, 2021. (Hwang Decl., Ex. D at 43).

**B.   Procedural Background**

Plaintiff initiated this action with the filing of the Complaint on February 10, 2021. (Dkt. #1). On April 19, 2021, Defendants filed a letter indicating their intent to move to dismiss the Complaint. (Dkt. #15). Plaintiff filed a responsive letter on April 23, 2021, which also advised the Court of its contemplated motion to disqualify defense counsel. (Dkt. #19). Defendants filed an additional letter on April 26, 2021, denying the existence of the purported conflict raised by Plaintiff. (Dkt. #20). The following day, the Court convened a conference, at which it set a briefing schedule for Plaintiff's motion to disqualify. (*See* Minute Entry for April 27, 2021). The Court rendered an oral decision denying Plaintiff's disqualification motion on November 3, 2021. (Dkt. #44 (order), 68 (transcript)).

A week following its decision on the disqualification motion, on
November 10, 2021, the Court endorsed the parties' proposed briefing schedule
for Defendants' anticipated motion to dismiss.  (Dkt. #47).  Pursuant to that
briefing schedule, Defendants filed their motion to dismiss and supporting
papers on January 10, 2022.  (Dkt. #57-59).  Plaintiff filed its opposition
papers on February 28, 2022.  (Dkt. #64-65).  Defendants filed their reply brief
on March 28, 2022.  (Dkt. #70).  Accordingly, Defendants' motion to dismiss is
fully briefed and ripe for the Court's consideration.

## DISCUSSION

Plaintiff asserts three claims against Defendants for their unilateral
decision to launch BET's House Party: (i) copyright infringement, in violation of
Plaintiff's rights under the Copyright Act, 17 U.S.C. §§ 106 and 501; (ii) breach
of implied contract; and, if the Court denies the existence of an implied
contract, (iii) *quantum meruit* and unjust enrichment.  The Court sets forth the
applicable legal standards for a motion to dismiss before assessing each of
Plaintiff's claims.

## A.  Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to relief that is
plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell
Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible
'when the plaintiff pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the misconduct alleged.'"

10

*Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks, alterations, and citation omitted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions").

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials."  *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  This narrow universe includes the "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken."  *Id.* (internal alterations and citation omitted); *see also United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  Where the disputed works in a copyright action are attached to or incorporated by reference in the complaint, a district court can "consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation."  *Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010).

On this motion, the Court considers several additional documents that are either incorporated by reference in or integral to the Complaint.  These

documents are: (i) the One Sheet (Hwang Decl., Ex. A); (ii) the Treatment (*id.*, Ex. B); (iii) the 25 video files of the recorded episodes of BET's House Party (*id.*, Ex. C); (iv) the promotional flyers for BET's House Party (*id.*, Ex. D); (v) various email correspondence between and among Plaintiff, Low, and Defendants (*id.*, Ex. E-F)[6]; and (vi) a list compiled by Plaintiff of BET's House Party livestreams, with notations to indicate whether each episode was included in Defendants' video files or promotional flyers (Lebowitz Decl., Ex. 3).  Finally, the Court may also consider the search results on the Internet Movie Database (IMDb) website for works with the title match "House Party," as this is an appropriate subject of judicial notice.  (Hwang Decl., Ex. H).  *See Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166-67 (S.D.N.Y. 2015) (collecting cases to support taking judicial notice of publicly available LexisNexis database search); *see also United States* v. *Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (upholding judicial notice where "a judge need only take a few moments to confirm [her] intuition by conducting a basic Internet search").

## B.    Copyright Infringement

Plaintiff's first cause of action is for copyright infringement, pursuant to the Copyright Act, 17 U.S.C. §§ 106 and 501, for Defendants' alleged violation of Plaintiff's exclusive rights to the House Party Treatment.  For the reasons discussed below, this claim survives Defendants' motion to dismiss.

---

[6]    The Court does not consider the June 15, 2016 email, attached as exhibit G to the Hwang Declaration, as it is neither referenced in nor integral to the Complaint. Moreover, the Court does not consider the factual assertions contained in the Lebowitz Declaration, except to the extent they are contained in the Complaint.

1.    **Applicable Law**

The Copyright Act vests the owner of a copyrighted work with "the exclusive right to ... reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." *Arista Records, LLC* v. *Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106). To state a claim for copyright infringement, "a plaintiff with a valid copyright must demonstrate that: [i] the defendant has actually copied the plaintiff's work; and [ii] the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito*, 602 F.3d at 63 (quoting *Hamil Am. Inc.* v. *GFI*, 193 F.3d 92, 99 (2d Cir. 1999)).

With respect to the first prong of the copyright infringement analysis, a plaintiff "may prove copying by direct evidence, or by showing that the defendant had access to the plaintiff's work and that the works are similar enough to support an inference that the defendant copied the plaintiff's work." *Hines* v. *W Chappell Music Corp.*, No. 20 Civ. 3535 (JPO), 2021 WL 2333621, at *2 (S.D.N.Y. June 8, 2021) (quoting *Fisher-Price, Inc.* v. *Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994)); *see also Jorgensen* v. *Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) ("[A] plaintiff may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material, and that there are similarities between the two works that are probative of copying[.]" (internal quotation marks and citations omitted)).

13

As to the second prong of the analysis, "questions of non-infringement have traditionally been reserved for the trier of fact." *Peter F. Gaito*, 602 F.3d at 63 (internal citations omitted). Nevertheless, "where the court has before it all that is necessary to make a comparison of the works in question, it may rule on substantial similarity as a matter of law on a Rule 12(b)(6) motion to dismiss." *King Zak Indus., Inc.* v. *Toys 4 U USA Corp.*, No. 16 Civ. 9676 (CS), 2017 WL 6210856, at *4 (S.D.N.Y. Dec. 8, 2017) (quoting *Effie Film, LLC* v. *Pomerance*, 909 F. Supp. 2d 273, 290-91 (S.D.N.Y. 2012)). This is because "[w]hen a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because 'what is required is only a visual [or aural] comparison of the works.'" *Peter F. Gaito*, 602 F.3d at 64 (citation omitted). If in making such a comparison, "the district court determines that the two works are 'not substantially similar as a matter of law,' the district court can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not 'plausibly give rise to an entitlement to relief.'" *King Zak Indus.*, 2017 WL 6210856, at *4 (quoting *Peter F. Gaito*, 602 F.3d at 64).

The substantial similarity prong entails a highly nuanced, detailed inquiry that is tailored to the works at issue in any given case. Indeed, courts have acknowledged that "[t]he determination of the extent of similarity that will constitute a *substantial*, and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations." *Horizon Comics Prods., Inc.* v. *Marvel Entm't, LLC*,

246 F. Supp. 3d 937, 940 (S.D.N.Y. 2017) (citation omitted); *Hines*, 2021 WL 2333621, at *2 (same); *see also Peter Pan Fabrics, Inc.* v. *Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) ("The test for infringement of a copyright is of necessity vague.").

The first step in determining whether substantial similarity exists is selecting the appropriate test. "Where the works in question contain entirely protectable elements, the standard test is whether 'an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *King Zak Indus.*, 2017 WL 6210856, at *4 (quoting *Yurman Design, Inc.* v. *PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001)). On the other hand, when particular works include a combination of protectable and unprotectable elements, the analysis is "more discerning." *Horizon Comics*, 246 F. Supp. 3d at 941; *see also Peter F. Gaito*, 602 F.3d at 66 ("[W]e have noted that when faced with works that have both protectible and unprotectible elements, our analysis must be 'more discerning.'" (internal quotation marks omitted)). This more discerning ordinary observer test calls for courts to "attempt to extract the unprotectible elements from … consideration and ask whether the protectible elements, standing alone, are substantially similar." *Peter F. Gaito*, 602 F.3d at 66 (quoting *Knitwaves, Inc.* v. *Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995)). "To apply the more discerning ordinary observer test, 'the Court looks to whether the alleged similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is

free for the taking.'" *King Zak Indus.*, 2017 WL 6210856, at *4 (quoting *Horizon Comics*, 246 F. Supp. 3d at 941).

Irrespective of which of the above tests applies, the Second Circuit has "disavowed any notion" that courts are "required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable." *Peter F. Gaito*, 602 F.3d at 66 (quoting *Knitwaves, Inc.*, 71 F.3d at 1003). Rather, "[t]he inquiry is more holistic, as the Court 'compares the contested work's total concept and overall feel with that of the allegedly infringed work, as instructed by our good eyes and common sense." *Horizon Comics*, 246 F. Supp. 3d at 941 (internal alterations omitted) (quoting *Effie Film*, 909 F. Supp. 2d at 292). This approach permits a finding of copyright infringement where a defendant has "parrot[ed] properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art — the excerpting, modifying, and arranging of unprotectible components — are considered in relation to one another." *Peter F. Gaito*, 602 F.3d at 66 (internal alterations omitted) (quoting *Tufenkian Imp./Exp. Ventures, Inc.* v. *Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003)). The inquiry necessarily focuses on whether the alleged infringer has misappropriated "the author's original contributions" to the subject work, that is, "the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work." *Knitwaves, Inc.*, 71 F.3d at 1004 (quoting *Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991)).

### 2.    Plaintiff Has Stated a Claim for Copyright Infringement

Defendants appear to concede for purposes of this motion that Plaintiff

has adequately alleged their actual copying of Plaintiff's protected work.  (Def.

Br. 8 ("On motions to dismiss, the Court can assume that actual copying has

occurred to analyze whether the parties' works are substantially similar with

respect to their protectable elements.")).[7]  The parties disagree on other facets

of the infringement analysis, namely whether Defendants copied any

protectable element of Plaintiff's work, and whether the total concept and feel of

the two works support a finding of substantial similarity.  On the record now

before it, the Court is without sufficient information to determine as a matter of

law that "no reasonable jury, properly instructed, could find that the two works

are substantially similar."  *Peter F. Gaito*, 602 F.3d at 63 (citation omitted).

### a.    Plaintiff's House Party Contains Both Protectable and Unprotectable Elements

The Court begins by determining whether the standard or more

discerning ordinary observer test applies in this case.  To resolve this threshold

---

[7]    Even if Defendants had challenged Plaintiff's allegations of actual copying, the Complaint includes allegations that Defendants "had access to the copyright material" and that "there are similarities between the two works that are probative of copying." *Jorgensen* v. *Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003).  For one, Plaintiff alleges that during its years of negotiations with Defendants, it shared extensive information about the show's concept with Defendants.  (*See, e.g.*, Compl. ¶¶ 19-28). Plaintiff also alleges that BET's House Party mimics its work in several ways, including, among other things, by using (i) the name "House Party"; (ii) a logo on two lines with all capitalized, sans serif letters; (iii) livestreams from mobile devices; (iv) distribution via social media; (v) a real-time, unscripted format; (vi) advertising via "invitations" to a "party"; and (vii) a fluid aspect ratio that oscillates between vertical and horizontal.  (Pl. Opp. 4, 12-14; Compl. ¶¶ 74-78).  *See, e.g.*, *Int'l Diamond Imps., Inc.* v. *Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 511 (S.D.N.Y. 2014) ("Similarities between the two works are probative [of copying] only if the similarities would not be expected to arise if the works had been created independently." (internal quotation marks omitted)).

issue, the Court must determine whether Plaintiff's House Party comprises only protectable elements or a mix of protectable and unprotectable elements.

In moving to dismiss, Defendants argue that the alleged similarities between the works at issue are not protectable expression.  (Def. Br. 10-12). More specifically, Defendants contend that Plaintiff cannot assert copyright protection over the title "House Party," the use of a vertical-aspect ratio, a roster of performers, or a particular distribution schedule.  (*Id.*).  Defendants further argue that since these unprotectable features exhaust the similarities that exist between the two works, the remaining protectable features of the Treatment are not substantially similar to Defendants' work.  (*Id.* at 13-14). Plaintiff maintains that it does not seek to protect a "general idea," but rather "the manner in which [it] selected, coordinated, and arranged the elements" of its work.  (Pl. Opp. 8-9).

"A fundamental rule of copyright law is that it protects only 'original works of authorship,' those aspects of the work that originate with the author himself."  *Zalewski* v. *Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014) (quoting 17 U.S.C. § 102(a)).  "Everything else in the work, the history it describes, the facts it mentions, and the ideas it embraces, are in the public domain free for others to draw upon."  *Id.*  "It is the peculiar *expressions* of that history, those facts, and those ideas that belong exclusively to their author." *Id.* "This principle, known as the 'idea/expression dichotomy,' 'assures authors the right to their original expression, but encourages others to build freely

upon the ideas and information conveyed by a work.'" *Peter F. Gaito*, 602 F.3d at 67 (quoting *Feist*, 499 U.S. at 349-50).

Still, "[a] work may be copyrightable even though it is entirely a compilation of unprotectable elements." *Wolstenholme* v. *Hirst*, 271 F. Supp. 3d 625, 635 (S.D.N.Y. 2017) (citing *Yurman Design*, 262 F.3d at 109; *Knitwaves, Inc.*, 71 F.3d at 1003-04). As noted above, it is the author's original contributions that are entitled to copyright protection, *i.e.*, the way the author has "selected, coordinated, and arranged" the elements of his or her work. *Knitwaves, Inc.*, 71 F.3d at 1004. In other words, "[t]he Copyright Act protects original and minimally creative selection of preexisting, unprotected materials (such as facts) for inclusion in a work, as well as original and creative arrangement of those materials." *Matthew Bender & Co.* v. *West Pub. Co.*, 158 F.3d 674, 681 (2d Cir. 1998) (citing *Eckes* v. *Card Prices Update*, 736 F.2d 859, 863 (2d Cir. 1984)).

Defendants do not contest that the Treatment contains expressive elements that are subject to copyright protection. (Def. Reply 3).[8] At the same time, Plaintiff does not explicitly dispute that the Treatment also contains unprotectable elements. For instance, Plaintiff cannot predicate its copyright infringement claim on Defendants' use of the common title "House Party." *See, e.g.*, *Lewinson* v. *Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 569 (S.D.N.Y.

---

[8]     Additionally, the copyright registration that Plaintiff received from the United States Copyright Office stands as *prima facie* evidence of the protectability of its work. (Treatment). *See Boisson* v. *Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001) ("Plaintiffs' certificates of registration constitute *prima facie* evidence of the validity not only of their copyrights, but also of the originality of their works.").

2009) ("[T]he title of a work cannot form the basis for a copyright infringement claim."); *Moody* v. *Morris*, 608 F. Supp. 2d 575, 579 (S.D.N.Y. 2009) ("[I]t is axiomatic that words, short phrases, titles, and slogans are not subject to copyright, even if they can be trademarked."), *aff'd*, 407 F. App'x 434 (Fed. Cir. 2011) (unpublished per curiam decision).[9]  Furthermore, any copyright protection of the Treatment cannot confer a monopoly over the medium of live-streaming, or the general use of a vertical camera orientation.  *See Fulks* v. *Knowles-Carter*, 207 F. Supp. 3d 274, 281 (S.D.N.Y. 2016) ("Plaintiff's alleged similarities in orientation and camera angle — 'left' facing and shot 'from the left' — … are so general that they rise to the level of unprotected ideas."). Moreover, any appeal to a "similar roster of performers" or a similar "distribution schedule" cannot advance Plaintiff's infringement argument, as the Treatment makes no reference whatsoever to a roster of performers or a distribution schedule.  (*See* Treatment; *see also* Def. Br. 12).

    Plaintiff contends that its Treatment represents an aggregation of several creative choices that, when assessed together, is entitled to copyright protection.  These choices include, but are not necessarily limited to, Plaintiff's decision to present a show about a house party using: (i) livestreaming from mobile devices; (ii) real-time interaction and distribution via social media; (iii) an organic and unscripted format; (iv) a hybrid aspect ratio that switches

---

[9]     Indeed, there are at least 68 other works that share the title of "House Party," as evidenced by a search of the Internet Movie Database (IMDb).  (Hwang Decl., Ex. H). *See Arica Inst., Inc.* v. *Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992) ("[T]he 'ordinary' phrase may be quoted without fear of infringement[.]").

between a selfie-style vertical aspect ratio and a more traditional horizontal aspect ratio; and (v) intimate viewer access.  (Pl. Opp. 4, 12-14).  While none of these elements, in and of themselves, is protectable, the Court agrees that the sum total of Plaintiff's artistic choices in the Treatment constitutes a protectable work under copyright law.  *See Yurman*, 262 F.3d at 109 ("Copyright law may protect a combination of elements that are unoriginal in themselves.").

The Court is convinced that Plaintiff's copyrighted work contains both protectable and unprotectable elements.  Therefore, the Court agrees with Defendants that the "more discerning" ordinary observer test is the appropriate test to determine whether Defendant's infringing work is substantially similar to the Treatment.  *See, e.g.*, *Shull* v. *TBTF Prods. Inc.,* No. 18 Civ. 12400 (GBD), 2019 WL 5287923, at *9 (S.D.N.Y. Oct. 4, 2019) (applying "more discerning" substantial similarity analysis where subject work — book that blends fiction with author's personal experiences — contains both protectable and unprotectable elements); *Horizon Comics*, 246 F. Supp. 3d at 942-43 (same, in the context of depiction of superhero in promotional poster).

> **b.**   **The Court Cannot Conclude As a Matter of Law That There Is No Substantial Similarity Between the Subject Works**

Defendants argue that after removing the unprotectable elements from the analysis, as called for by the "more discerning" ordinary observer test, a comparison of the total concept and feel of the subject works demonstrates that they are entirely dissimilar.  (Def. Br. 13-14).  While Defendants point out

21

salient distinctions between the concepts and the feel of the two works, the record is insufficient to permit the Court to determine, as a matter of law, that there is no substantial similarity between them.

Undoubtedly, there are notable differences in the total concept and feel of Plaintiff's House Party and Defendants' House Party, as reflected by the materials available to the Court on this motion.  Perhaps the most obvious difference is that Plaintiff's House Party involves a literal party, characterized by loud music, large crowds, and celebrity intrigue.  (*See generally* Treatment). BET's House Party, on the other hand, does not center on a raucous party, but rather seeks to bring varied forms of entertainment to a social media audience. In fact, Defendants' work does not appear to have any consistent theme between episodes, as each livestream session has a different focus and feel, depending on the featured guest.

Notwithstanding these readily observable differences, the incompleteness of the record precludes dismissal of Plaintiff's copyright claim.  Defendants have submitted to the Court on this motion only 25 recorded episodes of BET's House Party, a fraction of the total number of livestreamed episodes of Defendants' series.  (*See* Lebowitz Decl., Ex. 3 (chronicling, without purporting to be exhaustive, 86 episodes of BET's House Party)).  Defendants also represent that they have submitted all available promotional flyers, which materials are also not coextensive with the list of episodes compiled by Plaintiff. (*Compare* Hwang Decl., Ex. D, *with* Lebowitz Decl., Ex. 3).  At this stage of the proceedings, the Court is without sufficient information to even determine with

22

precision the total number of episodes of BET's House Party.  Given these deficits, the Court does not have all of the information necessary to compare the works, making dismissal of Plaintiff's claims inappropriate.  *See Peter F. Gaito*, 602 F.3d at 64 (explaining that resolving the question of substantial similarity is appropriate on a motion to dismiss where "the court has before it all that is necessary in order to make such an evaluation").  Despite compelling arguments presented by Defendants as to the dissimilarity between the two works, this appears to be one of those "certain instances of alleged copyright infringement where the question of substantial similarity cannot be addressed without the aid of discovery[.]"  *Id.* at 65; *cf. Amimon Inc.* v. *Shenzhen Hollyland Tech. Co. Ltd.*, No. 20 Civ. 9170 (ER), 2021 WL 5605258, at *12 (S.D.N.Y. Nov. 30, 2021) (denying motion to dismiss in copyright infringement action where additional evidence was necessary to determine substantial similarity because the allegedly infringing source code was not presented to the court).[10]

Given the diversity and inconsistency among the episodes of BET's House Party, there exists the possibility — even if remote — that Defendants livestreamed an episode that was substantially similar to Plaintiff's work. Defendants harp on the fact that none of the evidence presently available bears similarity to Plaintiff's copyrighted work; however, this cannot mandate

---

[10]  The Court does not doubt Defendants' representation that they have produced all recordings and promotional materials that are in their custody, possession, or control. (Def. Reply 6 n.2).  The fact remains that the Court is unable to assess the entirety of the allegedly infringing work, which makes dismissal inappropriate at this stage.  That Defendants are unable to produce any additional recordings or promotional flyers does not mean that Plaintiff is without any avenue to gather additional information about the missing episodes that might bear on the substantial similarity inquiry.

dismissal of this case at this stage.  As Judge Learned Hand observed, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate."  *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936).  And given the Court's acceptance of Plaintiff's allegations that Defendants actually copied the Treatment, the Court cannot at this stage rely on Defendants' assurance that no facet of BET's House Party is substantially similar to the Treatment.  As such, Plaintiff is entitled to discovery on its copyright infringement claim.

## C.    Breach of Implied Contract

Plaintiff next alleges that Defendants breached the terms of an implied-in-fact contract when they went forward with the House Party concept without compensating Plaintiff.  By Plaintiff's own allegations, this claim is implausible.

### 1.    Applicable Law[11]

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  *Edwards* v. *Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (citation omitted).  "[A]bsent a written agreement between the parties, a contract may be implied where inferences may be drawn from the facts and

---

[11]    In their briefing, both parties apply New York law to Plaintiff's implied-breach-of-contract claim.  (Def. Br. 14-16; Pl. Opp. 17-20).  This implied consent is sufficient to establish choice of law, and thus the Court applies New York law to this claim.  *Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent ... is sufficient to establish choice of law." (internal quotation marks omitted)).

circumstances of the case and the intention of the parties as indicated by their conduct." *Shull*, 2019 WL 5287923, at *6 (quoting *Betty, Inc.* v. *PepsiCo, Inc.*, 283 F. Supp. 3d 154, 166 (S.D.N.Y. 2017)). "Contracts that are implied in fact are 'just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by [written] contract.'" *Id.* (quoting *Betty, Inc.*, 283 F. Supp. 3d at 166-67).

Importantly, to establish the existence of an implied contract, just as in the case of an express agreement, "a plaintiff must allege sufficient facts to establish 'an offer, acceptance of the offer, consideration, mutual assent, and intent to be bound.'" *Jinno Int'l Co.* v. *Premier Fabrics, Inc.*, No. 12 Civ. 7820 (LGS), 2013 WL 4780049, at *2 (S.D.N.Y. May 24, 2013) (quoting *Register.com, Inc.* v. *Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)); *see also Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 359 (S.D.N.Y. 2012) ("An implied-in-fact contract 'requires such elements as consideration, mutual assent, legal capacity and legal subject matter.'"). "The element of mutual assent ... must be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing." *Nadel* v. *Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 376 n.5 (2d Cir. 2000) (citation omitted). "[A] contract is not implied in fact where the facts are inconsistent with its existence ... or against the intention or understanding of the parties[.]" *Shull*, 2019 WL 5287923, at *6 (internal quotation marks omitted) (quoting *Betty, Inc.*, 283 F. Supp. 3d at 167).

25

### 2.    Plaintiff Has Not Stated a Claim for Breach of Implied Contract

Plaintiff's allegations concerning the history of its negotiations with Defendants toward an express agreement over House Party refute the existence of an implied agreement over the project.  The Court deems this lack of mutual assent, as evidenced by the parties' conduct and express communications, to control Plaintiff's breach-of-implied contract claim.

Plaintiff alleges that it "reasonably expected to be compensated" for Defendants' use of its ideas and materials and, further, that Defendants "voluntarily accepted Plaintiff's offer and disclosures," while understanding that their use of Plaintiff's ideas carried with it an "obligation" to "compensate and credit" Plaintiff.  (Compl. ¶¶ 90-91).  Defendants' failure to compensate or credit Plaintiff when it launched BET's House Party, Plaintiff asserts, breached the terms of this implied-in-fact contract.  (*Id.* at ¶¶ 93, 95).

The allegations in the Complaint paint a different picture of the parties' negotiations that counters the existence of an implied contract.  As Plaintiff details, the parties engaged in serious negotiations for a period of years, culminating in the exchange of written draft agreements for the House Party project that were never signed.  (*See, e.g.*, Compl. ¶¶ 2, 40).  By Plaintiff's own allegations, an express agreement was not reached because the parties disagreed over several material terms, including the extent of Defendants' ownership of the House Party concept and the inclusion of a break fee.  (*Id.* at ¶ 37).  Indeed, Plaintiff alleges that it "rejected the[ ] demands" embodied in Defendants' draft agreement.  (*Id.* at ¶ 40).  At this point, the parties' conduct

26

clearly does not imply their mutual assent over any contractual terms or any promise to which either party intended to be bound. *See Valentino* v. *Davis*, 703 N.Y.S.2d 609, 612 (3d Dep't 2000) ("A contract may not be implied in fact from the conduct of the parties where it appears that they intended to be bound only by a formal written agreement.").

Neither does any of the parties' subsequent communications plausibly suggest the existence of an implied contract. To the contrary, Defendants repeatedly rejected Plaintiff's attempts to revitalize the House Party project. For instance, on July 8, 2016, Siegman "explained that BET had decided not to move forward with the 'House Party' project." (Compl. ¶ 41). Similarly, on July 25, 2016, Orlando emailed Lebowitz and wrote "we ALL tried to get this done (your side and ours) but unfortunately we couldn't get it done in the right time frame." (*Id.* at ¶ 45). On August 15, 2017, Defendants sent an email to Lebowitz to explain that they were "going to pass on the opportunity" to work with Plaintiff on House Party. (*Id.* at ¶ 57). And the following day, Defendants followed up with a more detailed email explaining that "we wanted to close this chapter so that you could explore" the idea with other partners. (*Id.* at ¶ 59). Yet again, on March 30, 2018, Siegman informed Lebowitz via email that "[t]he show has no movement at this time. If you have an opportunity to shop the show to another network, you should do that." (*Id.* at ¶ 71).

Far from suggesting that the parties arrived at a mutual agreement, Plaintiff's allegations demonstrate that Defendants repeatedly rejected their attempts to negotiate an agreement. The parties' failed negotiations over House

Party belie the existence of an implied contract obligating Defendants to compensate Plaintiff for the very same subject matter.  *See, e.g.*, *Shull*, 2019 WL 5287923, at *15 (dismissing implied-in-fact contract claim because allegations did not connote "mutual understanding" of a contractual arrangement); *LPD N.Y., LLC* v. *Adidas Am., Inc.*, No. 15 Civ. 6360 (MKB) (RLM), 2016 WL 11264718, at *13 (E.D.N.Y. Aug. 25, 2016) (finding no implied contract where "the parties did not show their unambiguous mutual assent to the material terms of the agreement by word or deed"), *report and recommendation adopted*, 2017 WL 1162181 (E.D.N.Y. Mar. 27, 2017); *Nat'l Gear & Piston, Inc.*, 861 F. Supp. 2d at 359 (dismissing implied-breach-of-contract claim where allegations showed parties' intent to be bound only by a formal written agreement).[12]  Accordingly, Plaintiff's claim for breach of an implied-in-fact contract is dismissed.

### D.  *Quantum Meruit* and Unjust Enrichment

Plaintiff separately asserts, in the alternative to its breach of implied contract claim, equitable claims to recover in *quantum meruit* and unjust enrichment.  (Compl. ¶¶ 96-101).  Defendants contend that these state law claims are preempted by the Copyright Act because they merely recast Plaintiff's claim for copyright infringement.  (Def. Br. 18-19).  The Court agrees.

---

[12]    Plaintiff additionally argues that Rule 8(a)(2) does not require it to list each specific provision of its alleged implied contract with Defendants.  (Pl. Opp. 18).  This argument does not alter Plaintiff's allegations that refute the existence of an implied contract.

### 1.    Applicable Law

The Copyright Act bars state law claims based on "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106[.]"  17 U.S.C. § 301(a).  "Section 301 of the Copyright Act preempts a state law claim when (i) the work at issue 'come[s] within the subject matter of copyright' and (ii) the right being asserted is 'equivalent to any of the exclusive rights within the general scope of copyright.'"  *I.C. ex rel. Solovsky* v. *Delta Galil USA*, 135 F. Supp. 3d 196, 217 (S.D.N.Y. 2015) (quoting 17 U.S.C. § 301).  "The subject matter requirement is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works."  *Briarpatch Ltd., L.P.* v. *Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) (citation omitted).  "The general scope requirement is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law."  *Id.* (citation omitted)  "In other words, the state law claim must involve acts of reproduction, adaptation, performance, distribution or display."  *Id.* (citing 17 U.S.C. § 106).  However, if the state law claim includes "any extra elements that make it qualitatively different from a copyright infringement claim," then the claim is not preempted.  *Id.* at 305-06 (citations omitted).

"Applying New York law, we may analyze *quantum meruit* and unjust enrichment claims together as a single quasi contract claim."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc.* v. *Fine Host Corp.*, 418 F.3d 168, 175 (2d

Cir. 2005) (citation omitted).  "This is because '*quantum meruit* and unjust enrichment are not separate causes of action; rather, unjust enrichment is a required element for an implied-in-law, or quasi contract, and *quantum meruit*, meaning "as much as he deserves," is one measure of liability for the breach of such a contract.'" *Delta Galil USA*, 135 F. Supp. 3d at 218 (quoting *Di Simone* v. *CN Plumbing, Inc.*, No. 13 Civ. 5088 (JG), 2014 WL 1281728, at *6 (E.D.N.Y. Mar. 31, 2014)).

"To prevail on a claim of unjust enrichment, a party must show that [i] the other party was enriched, [ii] at that party's expense, and [iii] that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Delta Galil USA*, 135 F. Supp. 3d at 218 (quoting *Di Simone*, 2014 WL 1281728, at *5) (internal quotation marks omitted).  "In order to recover in *quantum meruit* under New York law, a claimant must establish [i] the performance of services in good faith, [ii] the acceptance of the services by the person to whom they are rendered, [iii] an expectation of compensation therefor, and [iv] the reasonable value of the services." *Id.* (quoting *Mid-Hudson,* 418 F.3d at 175).

"Courts in the Second Circuit have consistently held that unjust enrichment and *quantum meruit* claims brought under New York law are preempted by the Copyright Act." *Kennedy* v. *LaCasse,* No. 17 Civ. 2970 (KMK), 2017 WL 3098107, at *4 (S.D.N.Y. July 20, 2017) (collecting cases); *see also Roberts* v. *BroadwayHD LLC*, No. 19 Civ. 9200 (KPF), 2022 WL 976872, at *16 (S.D.N.Y. Mar. 31, 2022) (finding unjust enrichment claim preempted

where plaintiff sought "to use his unjust enrichment claim to recoup any damages that may not be recoverable under the Copyright Act"); *Delta Galil USA*, 135 F. Supp. 3d at 218-19 (finding unjust enrichment and *quantum meruit* claims "not qualitatively different from [plaintiff's] copyright infringement claim").

### 2.  Plaintiff's Claims for *Quantum Meruit* and Unjust Enrichment Are Preempted

Here, Plaintiff's claims for unjust enrichment and *quantum meruit* are predicated on allegations that Defendants unjustly benefitted from Plaintiff's copyrighted work by reproducing and distributing facets of Plaintiff's House Party without credit or compensation.  These allegations possess no qualitative difference from Plaintiff's copyright infringement claim.  Indeed, Plaintiff mounts no argument that these equitable claims are qualitatively distinct from its copyright infringement claim, instead focusing the bulk of its argument on the unrelated point that its breach of implied contract claims are not preempted — an argument that Defendants do not present.  (*See* Pl. Opp. 16-17).  Given that the bases of Plaintiff's *quantum meruit* and unjust enrichment claims are identical to those underpinning its claim for copyright infringement, these claims are preempted by the Copyright Act.  Accordingly, the Court dismisses Plaintiff's claims for *quantum meruit* and unjust enrichment.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  Plaintiff has adequately stated a claim for copyright infringement and may thus pursue discovery on this claim.  Plaintiff

has not, however, stated a claim for breach of implied contract.  Additionally, the Court dismisses Plaintiff's *quantum meruit* and unjust enrichment claims as preempted by federal law.

Defendants are directed to file an answer to the Complaint on or before July 11, 2022.  Further, the parties are directed to file a joint status letter regarding next steps in this case and a proposed case management plan on or before July 18, 2022.

The Clerk of Court is directed to terminate the pending motion at docket entry 57.

SO ORDERED.

Dated:      June 27, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

32