UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WALKIE CHECK PRODUCTIONS, LLC,

                              Plaintiff,

                    -v.-

VIACOMCBS INC., BLACK ENTERTAINMENT
TELEVISION LLC *d/b/a BET Networks*, and
BET PRODUCTIONS IV, LLC,

                              Defendants.

---

21 Civ. 1214 (KPF)

**SEALED OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:[1]

       Plaintiff Walkie Check Productions, LLC ("Walkie Check") is the owner of

a registered copyright in one or more treatments for a show entitled "House

Party."  In 2015, Plaintiff pitched the idea for House Party to several media

executives affiliated with Defendants ViacomCBS Inc. ("Viacom"), Black

Entertainment Television LLC d/b/a BET Networks ("BET"), and BET

Productions IV, LLC ("BET IV," and together with Viacom and BET,

"Defendants"), in the hopes of the show airing on the BET network.  However,

after several meetings, the parties were unable to reach an agreement and did

not move forward with the deal.  In early 2020, Defendants launched their own

"House Party" series on BET, which Plaintiff contends is substantially similar

to its copyrighted work.

       In an Opinion and Order dated June 27, 2022, the Court granted in part

and denied in part Defendants' motion to dismiss, finding in relevant part that

---

[1]     Daniel Rust, a rising second-year student at Columbia Law School and an intern in my
        Chambers, provided substantial assistance in researching and drafting this Opinion.

the incompleteness of the record precluded dismissal of Plaintiff's copyright claim. *See Walkie Check Prods., LLC* v. *ViacomCBS Inc.*, No. 21 Civ. 1214 (KPF), 2022 WL 2306943, at *9-10 (S.D.N.Y. June 27, 2022) ("*Walkie Check I*") ("Given the diversity and inconsistency among the episodes of BET's House Party, there exists the possibility — even if remote — that Defendants livestreamed an episode that was substantially similar to Plaintiff's copyrighted work.").

With discovery now complete, before the Court is Defendants' motion for summary judgment as to the remaining copyright infringement claim, and Plaintiff's cross-motion for spoliation sanctions against Defendants for their alleged failure to record episodes of their version of House Party after receiving notice of Plaintiff's intention to sue.  For the reasons that follow, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for sanctions.

## BACKGROUND[2]

### A.    Factual Background

Plaintiff Walkie Check, along with non-party TAD2000, Inc., is the co-owner of a registered copyright in a treatment for a show entitled "House Party"

---

[2]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendants' motion for summary judgment.  The Court primarily sources facts from Defendants' Local Rule 56.1 Statement (Dkt. #100 ("Def. 56.1")) and Plaintiff's Local Civil 56.1 Response to Defendants' 56.1 Statement (Dkt. #110 ("Pl. 56.1")); the Declaration of Wook Hwang (Dkt. #101 ("Hwang Decl.")) and the exhibits attached thereto, including the one-sheet description of Plaintiff's work that Plaintiff submitted to Defendants on or about September 30, 2015 (Dkt. #101-1 ("One-Sheet")), the certified deposit copy of the treatment describing Plaintiff's concept (Dkt. #101-2 (the "Original Treatment")), the video exhibits containing episodes of Defendants' work

dated September 30, 2015 (the "Original Treatment").  (Def. 56.1 ¶¶ 1, 4).

Defendants are media company Viacom (now Paramount Global) and its

subsidiaries, BET and BET IV.  (*Id.* ¶¶ 2-3).  Plaintiff pitched the "House Party"

concept to Defendants in 2015 using the Original Treatment and a one-sheet

summary document (the "One-Sheet").  (*Id.* ¶ 1).  Plaintiff's President, Steven

Lebowitz, continued to communicate with Defendants' executives regarding the

show's format through at least August 2017.  (Lebowitz Decl. ¶ 14).  Among

these communications was the circulation of a slightly-revised version of the

---

(Dkt. #101-3 ("Def. Video")), referenced by the number assigned in same and the production one-sheets for the BET Series (Dkt. #101-5 ("Production One-Sheets")); the declarations of Amber Mike (Dkt. #115 ("Mike Decl.")) and Kenneth E. Aldous (Dkt. #107 ("Aldous Decl.")) and the exhibits attached thereto, including the prior declarations of Marc Chamlin (Dkt. #107-5 ("Chamlin Decl.") and Joshua Lebowitz (Dkt. #107-1 ("J. Lebowitz Decl.")), submitted initially as part of Defendants' motion to dismiss; the declarations of Jonathan M. Borg (Dkt. #108 ("Borg Decl.")) and Steven Lebowitz (Dkt. #109 ("Lebowitz Decl.")), and the exhibits attached thereto, including the version of the show format dated June 13, 2017 (Dkt. #109-7 (the "June Treatment")), the Copyright Infringement Claims Chart (Dkt. #109-9 ("Pl. Claims Chart")), and the video and photographic evidence attached by USB (Dkt. #109-10 ("Pl. Video")).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a movant's Rule 56.1 Statement is supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Where Plaintiff agrees to a fact set forth in the Defendants' Rule 56.1 Statement in its entirety, the Court cites only to the Defendants' Rule 56.1 Statement.

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion for summary judgment as "Def. Br." (Dkt. #99); to Plaintiff's memorandum of law in opposition to Defendants' motion and in support of its cross-motion for spoliation sanctions as "Pl. Opp." (Dkt. #106); to Defendants' reply memorandum of law and opposition to Plaintiff's sanctions motion as "Def. Reply" (Dkt. #114); and to Plaintiff's reply memorandum of law in support of its cross-motion as "Pl. Reply" (Dkt. #116).

treatment dated June 13, 2017 (the "June Treatment," and together with the Original Treatment, the "Treatments"), which included edits like proposed sponsorship opportunities.  (*Id.* ¶ 11; *see also, e.g.*, June Treatment ¶¶ A1-3, A5, A8).[3]

Plaintiff's Treatments and One-Sheet depict a show centered around a "raucous" party located in a New York City apartment featuring a hostess, partygoers, celebrity guests, and musical performances.  (Def. 56.1 ¶ 4; *see also* Original Treatment ¶¶ A1, A4).  The One-Sheet characterizes the party as "the most exclusive and engaging party in New York City," where "tipsy A-listers retreat to let both their hair and their guards down" in a "casual off-the-cuff environment where anything and everything can happen," and where at-home viewers are given an insider's perspective.  (One-Sheet).  Some segments of the episode follow the hostess as she tours the "off-the-hook" party scene while speaking directly to the audience.  (Original Treatment ¶¶ A3-A4; Def. 56.1 ¶ 6).  She connects with the audience directly via livestreaming

---

[3]     As to several of Defendants' 56.1 statements that include a characterization of the Treatments, Plaintiff notes that:

> [T]he interpretation of the Treatment must be done alongside the One-Sheet that accompanied it, and within the context of the years of discussions between Plaintiff and Defendant, and the subsequent editorial revisions, annotations, elaborations, and other modifications to this document, the collection of which constitutes Walkie Check's 'House Party' Creation.

(Pl. 56.1 ¶¶ 4-8).  The Court has reviewed all of the evidence in context, and has not relied on the parties' characterizations of the relevant material.  Further, the Court observes that overbroad assertions of this type are insufficient to generate a genuine dispute of material fact necessary to defeat a motion for summary judgment.  As discussed *infra*, Plaintiff cannot expand its protected property beyond the scope of the copyright it obtained.

applications and films herself using vertical "selfie-friendly" aspect ratio framing (Original Treatment ¶ A1), but filming switches to HD multi-cam horizontal framing during musical performances (Def. 56.1 ¶ 7; Original Treatment ¶ A5).  The audience sees "crowd members pumping their fists and going crazy" during the musical performances.  (Def. 56.1 ¶ 5).  The hostess also intermittently "winds her way through the beautiful party guests to reach the stage," where she "engage[s] in friendly flirty party chat" with the artists and other celebrities, discussing celebrity gossip and upcoming projects.  (*Id.* ¶ 7; *see also* Original Treatment ¶ A6).  When a celebrity appears, pop-up graphics are shown above their heads featuring "facts about [the artist's] career, his latest project, [and] his album release date."  (Def. 56.1 ¶ 7; *see also* One-Sheet; Original Treatment ¶ B2).  Interspersed among the video clips are various party scene vignettes, including "tequila shots being thrown back at the bar, a couple grinding in the corner, [and] a boyfriend's hand finding his girlfriend's back pocket."  (Original Treatment ¶ B4).  "Amidst this madness," the show then cuts to the hostess's phone, at which point she narrates what is happening "with excitement plainly visible in her face" as the credits begin to appear.  (*Id* ¶ D4).  The show was meant to showcase the hostess utilizing then-existing social media livestreaming methods like Facetime and Periscope. (*Id.* ¶ A1).

Separately, on March 29, 2020, in the height of the COVID-19 pandemic, Defendants launched an episodic video series also called "House Party" (the "BET Series"), with its final episode streaming on January 20, 2021.  (Def. 56.1

¶¶ 9-10; Mike Decl. ¶ 3).  The BET Series did not appear on television —
rather, each episode was livestreamed to Instagram Live and/or Facebook Live.
(Mike Decl. ¶ 3).  The episodes of the BET Series varied in their subject matter,
themes, length, and cinematographic choices.  (Def. 56.1 ¶¶ 11, 13).  Some
episodes featured discussions on topics ranging from politics to race to pop
culture; other episodes offered fitness, cooking, yoga, or dance instruction.  (*Id.*
¶ 12).  For example, one episode consisted of a six-minute TikTok dance
tutorial, whereas another episode featured an hour-long discussion about
mental health.  (*Id.* ¶ 11).  Various episodes also featured musical
performances by musicians or DJs, sometimes called virtual "listening parties,"
"happy hours," and "Couchside Concerts."  (*Id.* ¶ 15).[4]  For these episodes,
because the artist was entirely in control of the video, there was little
consistency in the format camera orientation, quality, or performance space
across the board, inasmuch as some artists chose to perform outdoors, some
from recording studios, and some from their couches.  (*Id.*).  There were at least
ninety episodes created as part of the series.  (Lebowitz Decl. ¶ 17).

Concurrently with the streaming of these episodes, Defendants circulated
promotional and marketing materials for specific episodes of the BET Series.

---

[4]     In their respective Local Rule 56.1 statements, both sides offer conclusory statements
about the similarity (or lack thereof) between their respective works.  (*See* Def. 56.1
¶¶ 16, 19; Pl. 56.1 ¶¶ 15, 16, 19).  Questions about the similarity of the works are legal
questions that the Court addresses below.  The parties' competing characterizations of
the materials do not create a genuine dispute of material fact because "[i]n copyright
infringement actions, the works themselves supersede and control contrary descriptions
of them, including any contrary allegations, conclusions or descriptions of the works
contained in the pleadings."  *Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*, 602
F.3d 57, 64 (2d Cir. 2010) (internal quotation marks and citations omitted).

(*See* Hwang Decl., Ex. 4).  They also produced "one-sheets" that described the intended content of certain episodes.  (*See* Production One-Sheets). Defendants assert, and Plaintiff does not contest, that many episodes were not recorded because they were debuted via livestreaming platforms that do not automatically record streamed video content.  (Hwang Decl. ¶ 5; *see also* Pl. Opp. 18 n.12).

Upon learning of the BET Series, Plaintiff began to record some of the episodes as they streamed in anticipation of filing the instant suit against Defendants.  (Lebowitz Decl. ¶ 16).  On July 1, 2020, Plaintiff sent an email to its non-party business partner Tad Low (owner of TAD2000, Inc.), stating its intention to bring a lawsuit for copyright infringement against Defendants. (Aldous Decl., Ex. 5 (email thread)).  In his reply the following day, Low copied attorney Marc Chamlin of law firm Loeb & Loeb LLP ("Loeb & Loeb").  (*Id.*; Chamlin Decl. ¶ 12).  At the time, in addition to representing Low, Loeb & Loeb also represented Defendant Viacom.  (Chamlin Decl. ¶¶ 2, 14).  On July 15, 2020, Plaintiff's prior counsel Jonathan Borg emailed Chamlin regarding Plaintiff's potential claims, after which Chamlin notified Borg that Loeb & Loeb could not assist in any litigation against Defendants due to the conflict of interest.  (*Id.* ¶ 14).  Also on or about July 15, 2020, Borg delivered to Defendants a demand letter, which notified Defendants of Plaintiff's intent to file suit for copyright infringement.  (Def. Reply 3-4; Borg Decl. ¶ 5, Ex. 1).  The letter stated in relevant part:

> In view of BET's blatant intellectual property theft and breach of its various obligations, Plaintiff intends to commence legal action within seventy-two (72 hours) of your receipt of this letter seeking any and all monetary damages to which they may be entitled as a matter of law, declaratory relief adjudicating, *inter alia*, Plaintiff's entitlement to appropriate credit for its work in developing and creating the [BET Series], and such other and further relief that might be awarded by a court of appropriate jurisdiction.

(Borg Decl. ¶ 5, Ex. 1 at 2).  Borg delivered a second, similar demand letter to Defendants on or about August 11, 2020.  (Borg Decl., Ex. 2).

## B.   Procedural Background

Plaintiff initiated this action with the filing of the Complaint on February 10, 2021.  (Dkt. #1).  On April 19, 2021, Defendants filed a pre-motion letter regarding their anticipated motion to dismiss the Complaint. (Dkt. #15).  Plaintiff filed a responsive letter on April 23, 2021, which also advised the Court of its contemplated motion to disqualify defense counsel. (Dkt. #19).  Defendants filed an additional letter on April 26, 2021, denying the existence of the purported conflict raised by Plaintiff.  (Dkt. #20).  The following day, the Court convened a conference, at which it set a briefing schedule for Plaintiff's motion to disqualify.  (*See* Minute Entry for April 27, 2021). Following the close of briefing, the Court rendered an oral decision denying Plaintiff's disqualification motion on November 3, 2021.  (Dkt. #44).

A week after its decision on the disqualification motion, on November 10, 2021, the Court endorsed the parties' joint stipulation regarding their proposed briefing schedule for Defendants' motion to dismiss, and allowed Plaintiff until November 19, 2021, to file an amended complaint.  (Dkt. #47).  The

endorsement advised that no further amendments to the Complaint would be permitted.  (*Id.*)

Plaintiff did not file an amended complaint and, pursuant to the briefing schedule, Defendants filed their motion to dismiss and supporting papers on January 10, 2022.  (Dkt. #57-59; *see also* Dkt. #64-65, 70 (additional motion briefing)).  On June 27, 2022, the Court issued an opinion and order granting in part and denying in part Defendants' motion, leaving only the copyright infringement claim.  (Dkt. #71).

On September 23, 2022, the Court entered the parties' amended case management plan.  (Dkt. #80).  About a month into discovery, on October 18, 2022, counsel for Defendants requested that the Court issue a Court-ordered subpoena on Meta Platforms, Inc. for content associated with Defendants' social media accounts in an attempt to locate recordings of additional episodes of the BET Series for which neither party possessed a recording.  (Dkt. #88). The following day, the Court granted that request (Dkt. #89-90), although the subpoena did not yield additional recordings (Def. Br. 8).

On December 15, 2022, following the completion of fact discovery, the parties filed a joint status letter noting their intentions to file the instant motion for summary judgment and cross-motion for sanctions, and requesting a premotion conference (Dkt. #95), which the Court held on December 20, 2022 (December 20, 2022 Minute Entry).  At the conference, the Court set a briefing schedule for Defendants' intended motion for summary judgment and Plaintiff's cross-motion for spoliation sanctions.  (*Id.*).  Defendants filed their

motion and supporting documents on February 10, 2023.  (Dkt. #98-102).  On

March 24, 2023, Plaintiff filed its joint opposition brief and cross-motion for

spoliation sanctions along with supporting documents.  (Dkt. #105-111).  On

April 21, 2023, Defendants filed a joint reply brief in support of their motion

and an opposition to Plaintiff's cross-motion.  (Dkt. #114-115).  On May 12,

2023, Plaintiff filed its reply in support of its cross-motion.  (Dkt. #116).

On July 24, 2023, the Court filed and provided to the parties an

unredacted copy of this Opinion under seal and allowed the parties to propose

redactions in accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d

110 (2d Cir. 2006).  On or before **August 11, 2023**, the parties shall file a joint

letter suggesting redactions to the Opinion.  Taking the parties' suggestions

into consideration, the Court will then file a redacted version of the Opinion on

the public docket.

## DISCUSSION

### A.   The Court Denies Plaintiff's Cross-Motion for Spoliation Sanctions

Plaintiff asks the Court to impose sanctions on Defendants for spoliation

of evidence pursuant to Rule 37 of the Federal Rules of Civil Procedure and this

Court's inherent powers.  (*See* Dkt. #105 (Notice of Plaintiff's Cross-Motion)).

Because Plaintiff requests that the sanction take the form of an adverse

inference against Defendants in the disposition of their motion for summary

judgment, the Court will begin by addressing Plaintiff's cross-motion.  *See UMG*

*Recording, Inc.* v. *Escape Media Grp., Inc.*, No. 11 Civ. 8407 (TPG), 2014 WL

5089743, at *7 (S.D.N.Y. Sept. 29, 2014) (resolving sanctions motion first

where it affected disposition of concurrent summary judgment motion).

### 1.    Applicable Law

"Spoliation is the destruction or significant alteration of evidence, or the

failure to preserve property for another's use as evidence in pending or

reasonably foreseeable litigation." *Gilani* v. *Teneo, Inc.*, No. 22-169-cv, 2022

WL 17817895, at *2 (2d Cir. Dec. 20, 2022) (summary order) (quoting *West* v.

*Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (internal

quotation marks omitted)).  Rule 37(b)(2) of the Federal Rules of Civil Procedure

allows for sanctions for failure to comply with a discovery order, while Rule

37(e) allows for sanctions when a party has failed to preserve electronically

stored information.  Fed. R. Civ. P. 37(b)(2), (e).[5]  "Even in the absence of a

discovery order, a court may impose sanctions on a party for misconduct in

---

[5]    In particular, Rule 37(e) provides that:

> (e) Failure to Preserve Electronically Stored Information.   If
> electronically stored information that should have been preserved
> in the anticipation or conduct of litigation is lost because a party
> failed to take reasonable steps to preserve it, and it cannot be
> restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the
> information, may order measures no greater than necessary to cure
> the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive
> another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information
> was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

discovery under its inherent power to manage its own affairs." *Residential Funding Corp.* v. *DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002).

"The party seeking discovery sanctions on the basis of spoliation must show by a preponderance of the evidence: ([i]) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; ([ii]) that the records were destroyed with a culpable state of mind; and ([iii]) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Klipsch Grp., Inc.* v. *ePRO E-Com. Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (quoting *Chin* v. *Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012) (internal quotations omitted)).  "[T]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 494 (S.D.N.Y. 2022) (quoting *Fujitsu Ltd.* v. *Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (internal quotation marks omitted)). "Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." *Fujitsu Ltd.*, 247 F.3d at 436; *see also Kronisch* v. *United States*, 150 F.3d 112, 127 (2d Cir. 1998) ("[T]hat a party has intentionally destroyed evidence that it had an obligation to preserve is not the end of the story ... [w]e must also attempt to

determine whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction.").

"For spoliation sanctions to be appropriate … it is necessary that the sought-after evidence actually existed and was destroyed." *Smith* v. *Interstate Mgmt. Co. LLC*, No. 20 Civ. 10867 (KPF), 2022 WL 4537947, at *13 (S.D.N.Y. Sept. 28, 2022); *see Farella* v. *City of New York*, No. 05 Civ. 5711 (NRB), 2007 WL 193867, at *2, 4, 6 (S.D.N.Y. Jan. 25, 2007) (finding no spoliation where plaintiffs had "full and ample opportunity for discovery" and where they could not "establish that the evidence they allege was spoliated ever existed in the first place"), *aff'd*, 323 F. App'x 13 (2d Cir. 2009) (summary order); *Skyline Steel, LLC* v. *PilePro*, LLC, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015) (finding that party "had no duty to 'preserve' … data at issue because such data never existed"), *reconsideration granted in part on other grounds*, No. 13 Civ. 8171 (JMF), 2015 WL 3739276 (S.D.N.Y. June 15, 2015).  "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge." *Fujitsu Ltd.*, 247 F.3d at 436 (citing *West*, 167 F.3d at 779). An appropriate sanction for spoliation "is assessed on a case-by-case basis." *Id.* (citing *United States* v. *Grammatikos*, 633 F.2d 1013, 1019-20 (2d Cir. 1980)).

### 2.    The Court Does Not Find Spoliation on the Facts of This Case

According to Plaintiff, the requested sanction of an adverse inference is necessary to remedy the fact that Defendants failed to record various episodes of the BET Series as they were being livestreamed, and thus only produced

13

thirty-nine of the approximately ninety BET Series episodes in discovery.  (Pl. Opp. 4 n.1; Pl. Claims Chart).[6]

As with any request for sanctions, context matters.  The record in this case is clear that Plaintiff approached BET in 2015 with a highly particularized idea for content; the proffered idea concerned a specific location (a New York City brownstone), a specific setting (an "exclusive and engaging" after-party with both musicians and celebrities), and a specific ambience (loud, raucous, and full of people).  (*See generally* Original Treatment).  That is the idea that Plaintiff then copyrighted, despite its revisionist efforts in this litigation to suggest that its House Party treatment was an expansive concept "about bringing people together, regardless of their location, thereby allowing for an intimate experience for the viewer and artist."  (Lebowitz Decl. ¶ 10).

As happens with innumerable content pitches, BET elected to pass on the idea in 2016 and then again in 2018, when Plaintiff submitted a slightly revised treatment that amplified the discussion of potential sponsor opportunities.  *See Walkie Check I*, 2022 WL 2306943, at *3.  Later emails from Plaintiff to BET executives in 2018 and 2019 seeking to restart discussions bore no fruit.  *Id.*  (*See also* Lebowitz Decl., Ex. 2-3).  In 2020, in the midst of a global public health crisis that foreclosed social gatherings and forced people to remain at home to live and work, BET tried to develop content for people who

---

[6]     The Court acknowledges that there is a dispute about whether Defendants produced recordings of thirty-nine or forty episodes of the BET series because Plaintiff alleges that the recording of the episode labeled Def. Video 40 originated with Plaintiff.  (*See* Def. Br. 8; Pl. Opp. 4 n.1).  The Court will assume for purposes of this motion that Plaintiff's accounting is correct, although ultimately the issue is immaterial.

spent more time on their devices at home.  (Mike Decl. ¶ 4).  The result was a series of livestreamed episodes on numerous topics, including music.  Though BET also referred to this series as a "House Party," the connotation was the exact opposite of Plaintiff's House Party:  Rather than a show teeming with people, the guests in episodes of the BET Series were frequently alone or in small pods of people, and were often working from their own homes to bring content to others quarantined at home.  And while the BET hosts used social media outlets, such as Facebook Live and Instagram Live, to disseminate their work, such reliance on social media is unsurprising, given the technical limitations of working, and broadcasting, from home.

The notion that BET would appropriate Plaintiff's intellectual property — which relied on social media applications that are themselves constantly evolving — and keep it in its back pocket for years until an unforeseen global pandemic stranded viewers *and* hosts at home strains credulity.  Beyond that, however, a comparison of the two series makes plain that, other than the title, they are completely different, as discussed further *infra*.  Indeed, after a careful consideration of the record in its entirety, the Court finds nothing suggesting that any lost materials would have substantiated Plaintiff's claim of copyright infringement.  Plaintiff has adduced no proof supporting an inference that "the evidence [lost] would have been of some 'assistive relevance' and favorable to the moving party's claims or defenses," and it is within the Court's discretion to deny Plaintiff's motion for Rule 37(e)(2) sanctions accordingly.  *Taylor* v. *City of New York*, 293 F.R.D. 601, 613 (S.D.N.Y. 2013); *see also Ungar* v. *City of New*

15

*York*, 329 F.R.D. 8, 15 (E.D.N.Y. 2018) ("In order to craft a sanction that would restore [p]laintiff to the position [it] would have occupied had the recording not been deleted ... [it is within the court's] discretion to require some proof that [the lost evidence] would have corroborated [p]laintiff's claims."), *aff'd*, No. 21-1384-cv, 2022 WL 10219749 (2d Cir. Oct. 18, 2022) (summary order). Similarly, there is not "sufficient circumstantial evidence that relevant and prejudicial data was lost" to warrant any sanctions under this Court's inherent powers. *Klipsch Group, Inc.*, 880 F.3d at 630.

Plaintiff has also failed to show any violation of preservation obligations by Defendants. Plaintiff does not dispute Defendants' assertion that "because many of the episodes were not recorded when they were livestreamed, they are no longer available." (Pl. Opp. 18 n.12 (quoting Hwang Decl. ¶ 5 (internal quotations and alterations omitted))). In other words, given the nature of the technology at the time, Defendants would have had to take an extra, affirmative step to record the livestreams being broadcast over social media platforms. Plaintiff contends, however, that because it notified Chamlin on July 2, 2020, that it intended to bring claims against Defendants relating to the BET Series, "each time Defendants did not record and preserve a 'House Party' episode appearing after [that date], Defendants failed to comply with their preservation obligations," and, as such, should be subject to spoliation sanctions. (Pl. Opp. 18). The Court is unwilling, on these facts, to extend Defendants' preservation obligations as Plaintiff argues.

To begin, preservation obligations are exactly that — obligations to *preserve* potential evidence that, by definition, must already exist.  "[A] failure to create records — as opposed to the destruction of records that were kept — is not spoliation." *R.F.M.A.S., Inc.* v. *So*, 271 F.R.D. 13, 40 (S.D.N.Y. 2010), *report and recommendation adopted*, 271 F.R.D. 55 (S.D.N.Y. 2010).  Because preservation obligations do not include an affirmative duty to produce new records, Defendants' failure to implement a practice of recording the BET Series livestreams, even after receiving the alleged infringement notice from Plaintiff, cannot be the basis for a spoliation claim.

Plaintiff cites two cases in support of its proposition that such affirmative obligations exist, but neither case applies.  (Pl. Opp. 17).  *Moody* v. *CXS Transportation, Inc.*, 271 F. Supp. 3d 410, 422 (W.D.N.Y. 2017), involved a litigant's alleged mishandling of data that was automatically recorded (and thus created) by a locomotive's event recorder system.  Plaintiff has not alleged that the livestreams of Defendants' show were automatically recorded, and so the case is inapposite.  Similarly, the spoliation issue in *Aktas* v. *JMC Development Co.*, 877 F. Supp. 2d 1, 14-15 (N.D.N.Y. 2012), *aff'd*, 563 F. App'x 79 (2d Cir. 2014) (summary order), centered on a litigant's demolition of the opposing party's work product on a construction site.  Neither case holds that parties have an affirmative duty to create new records as part of preservation obligations, nor could they.

The Court recognizes that the increased proliferation of livestreamed content may make it less likely that information relevant to litigation is

memorialized.  That said, Plaintiff has not provided a compelling reason why livestreamed content should be treated differently than other situations in which potentially relevant information exists in some temporary form but is not, as a matter of course, automatically condensed into a record that may be either maintained or destroyed.  *See e.g., Smith*, 2022 WL 4537947, at *13 (finding no basis for spoliation where relevant "guest complaints made to hotel personnel other than the operator or front desk staff were not memorialized in any way"); *Adato* v. *Gala Tour, Inc.*, No. 07 Civ. 4029 (KAM), 2011 WL 4458852, at *9-10 (E.D.N.Y. Sept. 23, 2011) (finding no basis for spoliation because there was no evidence that party recorded relevant accident injury information into a logbook).  The Court will not create an exception for livestreamed content to the general rule that parties have no obligation to affirmatively create new records.  Though it may have behooved Defendants to record the livestreams, "such a shortcoming is simply not the destruction or alteration of evidence which is central to the doctrine of spoliation."  *Riddle* v. *Liz Claiborne, Inc.*, No. 00 Civ. 1374 (MBM) (HBP), 2003 WL 21976403, at *2 (S.D.N.Y. Aug. 19, 2003).

Even were the Court to find that Defendants had an obligation to record the livestreams after receiving notice from Plaintiff's counsel, it would conclude that sanctions were not warranted on this record.  The evidence suggests that, at most, Defendants were negligent in failing to take measures to record the livestreams after July 2020.  (*See, e.g.*, Mike Decl. ¶ 7 (acknowledging internal communication problems that prevented Plaintiff's letter from reaching Defendants' in-house counsel)).  Such negligence is insufficient to warrant the

sanctions Plaintiff now seeks.  *See Fashion Exch. LLC* v. *Hybrid Promotions, LLC*, No. 14 Civ. 1254 (SHS) (OTW), 2019 WL 6838672, at *3 (S.D.N.Y. Dec. 16, 2019) ("Whereas the previous version of Rule 37 permitted severe sanctions for negligent spoliation, pursuant to the amended Rule 37(e), the movant must now show that the non-moving party 'acted with the intent to deprive [plaintiff] of the information's use in the litigation' before the sanctions listed in subsection (2) of Rule 37(e) — *i.e.*, adverse inference, dismissal, or default judgment — are available." (citing Fed. R. Civ. P. 37(e)(2))); *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 44, 49 (1991) (holding that "[b]ecause of their very potency, inherent powers [to sanction] must be exercised with restraint and discretion" and "invocation of the inherent power would require a finding of bad faith").  What is more, even were the Court to find that Plaintiff could establish Defendants' failure to preserve the livestreams with a culpable state of mind, Plaintiff still "cannot demonstrate that the lost evidence would have supported [its] claims," and, as such, is not entitled to an adverse inference.  *Zubulake* v. *UBS Warburg LLC*, 220 F.R.D. 212, 222 (S.D.N.Y. 2003).  As discussed in greater detail in the next section, the record evidence demonstrates, as a matter of law, that there is no substantial similarity between the two works. The available evidence concerning the unpreserved livestreams makes clear that their production in discovery would not have generated a genuine dispute of material fact, and, more broadly, would not have changed the Court's legal conclusions.  The Court accordingly denies Plaintiff's motion for sanctions.

B.     **The Court Grants Defendants' Motion for Summary Judgment**

1.     **The Standard of Review**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[7]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely disputed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at 323, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (citing Fed. R. Civ. P. 56(e)).

---

[7]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from evidence in the record, however, the Court should not afford the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990) (internal quotation marks and citation omitted)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587).

### 2.    Copyright Law

"A fundamental rule of copyright law is that it protects only 'original works of authorship,' those aspects of the work that originate with the author himself." *Zalewski* v. *Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014) (quoting 17 U.S.C. § 102(a)). "Everything else in the work, the history it describes, the facts it mentions, and the ideas it embraces, are in the public domain free for others to draw upon." *Id.* "In addition, under the doctrine of *scènes à faire*, 'elements of an image that flow naturally and necessarily from the choice of a given concept cannot be claimed as original.'" *Fulks* v. *Knowles-*

21

*Carter*, 207 F. Supp. 3d 274, 279 (S.D.N.Y. 2016) (quoting *Bill Diodato Photography, LLC* v. *Kate Spade, LLC*, 388 F. Supp. 2d 382, 392 (S.D.N.Y. 2005)).

To state a claim for copyright infringement, a plaintiff must show both "([i]) ownership of a valid copyright, and ([ii]) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *accord Lipton* v. *Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995). In other words, federal law requires that "([i]) the defendant has actually copied the plaintiff's work; and ([ii]) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (quoting *Hamil Am. Inc.* v. *GFI*, 193 F.3d 92, 99 (2d Cir. 1999)).

With respect to the first prong of the copyright infringement analysis, a plaintiff "may prove copying by direct evidence, or by showing that the defendant had access to the plaintiff's work and that the works are similar enough to support an inference that the defendant copied the plaintiff's work." *Hines* v. *W Chappell Music Corp.*, No. 20 Civ. 3535 (JPO), 2021 WL 2333621, at *2 (S.D.N.Y. June 8, 2021) (quoting *Fisher-Price, Inc.* v. *Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994), *abrogated on other grounds by Salinger* v. *Colting*, 607 F.3d 68, 77 (2d Cir. 2010)).

As to the second prong of the analysis, generally "questions of non-infringement have traditionally been reserved for the trier of fact," *Peter F.*

*Gaito*, 602 F.3d at 63 (citations omitted), but "[t]he question of substantial similarity is by no means exclusively reserved for resolution by a jury … [and] in certain circumstances, it is entirely appropriate for a district court to resolve that question as a matter of law, 'either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar,'" *id.* (quoting *Warner Bros. Inc.* v. *Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983)).  "[A] district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff work, or when no reasonable trier of fact could find the works substantially similar." *Walker* v. *Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986).

"The substantial similarity prong entails a highly nuanced, detailed inquiry that is tailored to the works at issue." *A&E Television Networks, LLC* v. *Big Fish Ent., LLC*, No. 22 Civ. 7411 (KPF), 2023 WL 4053871, at *6 (S.D.N.Y. June 16, 2023).  "[T]he determination of the extent of similarity that will constitute a substantial, and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations." *Horizon Comics Prods., Inc.* v. *Marvel Ent., LLC*, 246 F. Supp. 3d 937, 940 (S.D.N.Y. 2017) (internal quotation marks omitted); *Hines*, 2021 WL 2333621, at *2 (same); *see also Peter Pan Fabrics, Inc.* v. *Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) ("The test for infringement of a copyright is of necessity vague.").

"The standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Yurman Design, Inc.* v. *PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001) (quoting *Hamil Am. Inc.*, 193 F.3d at 99).  But when, as the Court found in *Walkie Check I*, the works "include a combination of protectable and unprotectable elements, the analysis is 'more discerning.'" *Walkie Check I*, 2022 WL 2306943, at *7 (quoting *Horizon Comics*, 246 F. Supp. 3d at 941). This more discerning ordinary observer test calls for courts to "attempt to extract the unprotectible elements from our consideration and ask whether the protectible elements, standing alone, are substantially similar." *Peter F. Gaito*, 602 F.3d at 66 (quoting *Knitwaves, Inc.* v. *Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)).  "To apply the more discerning ordinary observer test, 'the Court looks to whether the alleged similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking.'"  *King Zak Indus., Inc.* v. *Toys 4 U USA Corp.*, No. 16 Civ. 9676 (CS), 2017 WL 6210856, at *4 (quoting *Horizon Comics Prods.*, 246 F. Supp. 3d at 941).

"No matter which test we apply, however, we have disavowed any notion that we are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.  Instead, we are principally guided by comparing the contested design's total concept and overall feel with that of the allegedly infringed work." *Peter F. Gaito*, 602

F.3d at 66 (internal quotation marks and citations omitted).  In determining whether the total concept and overall feel are substantially similar, the "numerous aesthetic decisions embodied in the plaintiff's work of art — the excerpting, modifying, and arranging of public domain compositions, if any, together with the development and representation of wholly new motifs . . . are considered in relation to one another." *Tufenkian Imp./Exp. Ventures, Inc.* v. *Einstein Moomjy, Inc.*, 338 F.3d 127, 135 (2d Cir. 2003).  If the court finds there are such similarities, it must then "determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking." *Id.* at 134-35.

The use of "stock concepts and *scènes à faire* …. though unprotectable on their own, can be subject to protection when their selection, coordination, and arrangement reflect a particular expression of ideas." *A&E Television Networks LLC*, 2023 WL 4053871, at *7 (internal quotations and citations omitted).  Moreover, "if a work copies the original way in which the author has selected, coordinated, and arranged these unprotectable elements to such an extent that the copying work is substantially similar to the expression of ideas and total concept and overall feel of the copied work, infringement can occur." *Williams* v. *A&E Television Networks*, 122 F. Supp. 3d 157, 162-63 (S.D.N.Y. 2015) (internal quotation marks and citations omitted).

### 3.    Analysis

"The first element of a copyright-infringement claim is 'ownership of a valid copyright.'"  *Star Athletica, L.L.C.* v. *Varsity Brands, Inc.*, 580 U.S. 405, 410-11 (2017) (quoting *Feist Publ'ns* 499 U.S. at 361).  "[C]ertificates of registration constitute *prima facie* evidence of the validity not only of their copyrights, but also of the originality of their works."  *Boisson* v. *Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001).  It is undisputed that Plaintiff co-owns a valid copyright in the Original Treatment issued by the United States Copyright Office.  (Hwang Decl., Ex. 2 (copy of Original Treatment certified by United States Copyright Office)).  As such, this element is satisfied.[8]

Next, Plaintiff must demonstrate "copying of constituent elements of [its] work that are original."  *Feist Publ'ns, Inc.*, 499 U.S. at 361.  That is, Plaintiff must show that the alleged "copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's,"

---

[8]    Plaintiff also claims that the June Treatment and One-Sheet were the subject of copyright infringement.  (*See* Lebowitz Decl. ¶¶ 12, 18).  Defendants do not contest that the Court may consider these documents in its analysis, and indeed include a copy of the One-Sheet as an exhibit in its papers.  (*See* Hwang Decl., Ex. 1).  The Court is less certain of its ability to consider these materials.  Of note, neither party has presented evidence as to whether the June Treatment and the One-Sheet are registered with the U.S. Copyright Office.  And 17 U.S.C. § 411(a) "bars a copyright owner from suing for infringement until 'registration ... has been made.'"  *Fourth Est. Pub. Benefit Corp.* v. *Wall-Street.com, LLC*, 139 S. Ct. 881, 885 (2019) (quoting 17 U.S.C. § 441(a)).  Because the parties have not alerted the Court as to the existence of these documents' registrations with the Copyright Office, the Court declines to decide the matter on these documents.

That said, the Original Treatment, the June Treatment, and the One-Sheet all describe fundamentally the same expression of ideas and set of aesthetic choices, and for the reasons the Court explains *infra*, none is substantially similar to the BET Series.  Therefore, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," *Celotex Corp.*, 477 U.S. at 323, the issue of valid copyright interests in the June Treatment and the One-Sheet (as well as the Court's consequent ability to consider those materials) is ultimately irrelevant to the disposition of Defendants' motion.

*Peter F. Gaito*, 602 F.3d at 63 (quoting *Hamil Am. Inc.* 193 F.3d at 99), rather than solely unprotectable elements that are "free for the taking," *King Zak Indus.*, 2017 WL 6210856, at *4 (internal quotations omitted).  At the motion to dismiss stage, Plaintiff argued, as it maintains here, that its work is protectable due to the show's use of: "(i) livestreaming from mobile devices; (ii) real-time interaction and distribution via social media; (iii) an organic and unscripted format; (iv) a hybrid aspect ratio that switches between a self-style vertical aspect ratio and a more traditional aspect ratio; and (v) intimate viewer access." *Walkie Check I*, 2022 WL 2306943, at *9.  (*See also* Pl. Opp. 4-5, 28-29).  This Court found that while "none of these elements, in and of themselves, is protectable, … the sum total of Plaintiff's artistic choices in the [Original] Treatment constitutes a protectable work under copyright law." *Walkie Check I*, 2022 WL 2306943, at *9.  This is because basic production choices such as the use of specific aspect ratios, home filming environments, and unscripted performances, are "so general that they rise to the level of unprotected ideas." *Fulks*, 207 F. Supp. 3d at 281 (finding same with regard to camera orientation and angle).  Similarly, because livestreaming is an increasingly common feature of modern media, Plaintiff cannot assert a monopoly on its usage.  The same can be said for the use of red stage lighting, *see Mena* v. *Fox Ent. Grp.*, 11 Civ. 5501 (BSJ) (RLE), 2012 WL 4741389, at *9 (S.D.N.Y. Sep. 29, 2012) (holding the use of a white light on a black background to be "simply too general to be restricted to his work and his work alone"), and invitations for viewers to join the party or engage with one another, the two additional elements Plaintiff

27

raises post-discovery as a basis for substantial similarity.  (Pl. Opp. 4-5, 28-29).

Where, as here, Plaintiff's work "represents an aggregation of several creative choices that, [only] when assessed together, is entitled to copyright protection," *Walkie Check I*, 2022 WL 2306943, at *9, Plaintiff's sole avenue for a copyright infringement claim is direct copying of "the original way in which [it] has selected, coordinated, and arranged the elements of [its] work." *Knitwaves, Inc.*, 71 F.3d at 1004 (internal quotation marks omitted).  Indeed, while such a compilation enjoys copyright protection, it is considered "thin," *Zalewski*, 754 F.3d at 107; *see also Feist Publ'ns*, 499 U.S. at 349, and a subsequent work will avoid infringement "so long as [it] does not feature the same selection and arrangement" of the common unprotectable elements as that in the original, *Feist Publ'ns*, 499 U.S. at 349-51.  In such circumstances, "the infringing work must involve 'very close copying' to survive."  *A&E Television Networks, LLC*, 2023 WL 4053871, at *12 (quoting *Zalewski*, 754 F. 3d at 107).  Such "very close copying" is simply not present here.  *See Fulks*, 207 F. Supp. 3d. at 293 (holding that for a plaintiff to prevail under such circumstances, a court must find that "an ordinary observer would … perceive defendants as having misappropriated the original way in which [Plaintiff] selected, coordinated, and arranged the elements of his work," and render the two works the same (internal quotation marks and citations omitted and alterations adopted)).

Of the ninety total episodes of the BET Series, Plaintiff states that thirty-nine are substantially similar to its work.  (Pl. Opp. 4).[9]  Of those thirty-nine episodes, there is video evidence available for thirteen (the "Available Episodes").  (*See* Pl. Claims Chart).  Where there is no video evidence, Plaintiff provides some combination of screenshots, promotional materials, and production materials (the "Unavailable Episodes").  (*See id.*).[10]  The Court addresses each category of episodes in turn, and finds as a matter of law that the works are not substantially similar.

### a.    The Available Episodes[11]

Plaintiff contends that the overall concept and feel of both works is similar because both works intended to provide a "privileged peek of their secret lairs of their favorite artists and take in private performances and interact with them (and each other) in real time."  (Lebowitz Decl. ¶ 5 (internal

---

[9]    For the avoidance of doubt, the Court notes that the remaining episodes for which video evidence is available bear very little similarity to Plaintiff's work.  These include episodes that primarily feature cooking tutorials (Def. Videos 1, 4, 5, 9 & 30), choreography lessons (Def. Videos 6, 29, 33 & 37), yoga and fitness coaching sessions (Def. Videos 2, 7, 23, 25, 27 & 32), a face mask demonstration (Def. Video 3), and interviews and discussions with public figures (Def. Videos 10, 11, 12, 13, 15, 17, 24, 26, 28, 31 & 35).  There are two additional videos (Def. Videos 39 & 40), which feature musical performances that Plaintiff has not alleged infringe upon their work.  For the same reasons the Court describes for the episodes that Plaintiff alleges are infringing, the Court finds that these two episodes are not substantially similar to Plaintiff's work.

[10]    In its briefing, Plaintiff says that there are twenty available episodes, but seven of those twenty include only screenshots, which this Court does not view as equivalent to video evidence.  (Pl. Claims Chart).  As such, they are assessed with the remaining episodes for which no video evidence is available.

[11]    The Available Episodes include Def. Videos 8, 14, 16, 18, 19, 20, 21, 22, 34, 36, and 38; and Pl. Videos 8, 9, 13, 18, 19, 20, 21, 22, 24, 35, and 37.  Pursuant to Plaintiff's Claims Chart, the following videos are from the same episode:  Pl. Video 9 & Def. Video 8; Pl. Video 18 & Def. Video 14; Pl. Video 19 & Def. Video 16; Pl. Video 20 & Def. Video 18; Pl. Video 21 & Def. Video 19, Pl. Video 22 & Def. Video 20; Pl. Video 24 & Def. Video 22; Pl. Video 35 & Def. Video 34; and Pl. Video 37 & Def. Video 36.  The following episodes do not have duplicates: Pl. Videos 8 and 13; Def. Videos 21 and 38.

quotation marks omitted)).  Even assuming that Plaintiff's characterization is correct, the "total concept and feel" analysis cannot be used to protect such general ideas absent direct copying.  Stated differently, Plaintiff cannot rest its claim on both shows' intimate livestreamed musical experiences, because the two present as wholly distinctive when considered side-by-side.  Indeed, "the particular aesthetic decisions" that make Plaintiff's work original are simply not present in the BET Series.  *See Tufenkian Import/Export Ventures, Inc.*, 338 F.3d at 134 ("[The] numerous aesthetic decisions embodied in the plaintiff's work of art — the excerpting, modifying, and arranging of [unprotectible elements] ... — are considered in relation to one another.").

The concept and feel of Plaintiff's work is largely defined by its environs: the "off-the-hook," "exclusive and engaging after-party" featuring "tipsy A-listers" that is "capturing spontaneous action" in a "casual off-the-cuff environment where anything goes and everything can happen."  (One-Sheet).  The marked absence of those thematic elements from the BET Series means that no "average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work[.]"  *Knitwaves, Inc.*, 71 F.3d at 1001 (internal quotation marks and citations omitted).

It is true that the works are similar in that they have both selected and combined certain common unprotected elements — namely, different types of camera angles, video livestreaming, musical performances, red lighting, and casual filming environments.  However, such a selection and combination of elements flows naturally from the common, unprotectable choice of videos

30

about performance, which stock elements are not protectable.  *See LaPine* v.
*Seinfeld*, No. 08 Civ. 128 (LTS) (RLE), 2009 WL 2902584, at *9 (S.D.N.Y.
Sept. 10, 2009) (finding that "[a]n introduction by a doctor, an author's
narrative about her struggle to convince her kids to eat healthy foods, and a
title and artwork using words or pictures to convey sneaking or hiding
vegetables[,] all flow naturally from the chosen subject matter"), *aff'd*, 375 F.
App'x 81 (2d Cir. 2010) (summary order).

The Court notes that these elements, when viewed in isolation, follow
naturally from the idea of an intimate concert production tailored for the
Internet, a general concept unoriginal to Plaintiff.  In fact, the particular
combination of elements that Plaintiff identifies is common to many musical
performances produced for distribution on the Internet.  *See generally* Chris
Parsons, *Music and the Internet in the Age of Covid-19*, 48 EARLY MUSIC 403,
403-05 (2020) (describing various online musical performances involving the
use of similar elements).  It is therefore unremarkable that the BET Series
episodes featuring musical performances contain some combination of
livestreaming, audience interaction, an unscripted format, an intimate setting,
and vertical "selfie-style" or horizontal "HD" aspect framing.  Plaintiff cannot
have a monopoly on the livestreaming of musical performances set in a more
casual environment or those using red stage lighting, and copyright law
requires that the alleged copying do more than "only capture the generalities of
the style in which Plaintiff worked and elements common to all [works in the
medium]." *Zalewski*, 754 F.3d at 107.  Therefore, substantial similarity would

require the combination of these elements with at least some of the other features described in the Treatment.

Indeed, what made Plaintiff's work original (and thus copyrightable) is the combination of the aforementioned stock elements with its specific, insider's view of a *literal* house party, as guided by a chatty hostess in a New York City brownstone. Because Plaintiff's work's "protectability rests on a thin original contribution," *A&E Television Networks, LLC*, 2023 WL 4053871, at *12 (quoting *Zalewski*, 754 F.3d at 107), Defendants would have had to engage in direct copying of what made Plaintiff's work original — namely, the combination of such stock elements amid a "raucous party" (Original Treatment ¶ A1), filled with "beautiful party guests," a hostess who engages in "friendly flirty party chat" (*id.* at ¶ A6), and performances that make the crowd "go[] crazy" (*id.* at ¶ A5) — for the work to be infringing, instead of mere copying of *scènes à faire* of an at-home concert. *See Zalewski*, 754 F.3d 95 at 106-07.

Plaintiff has failed to demonstrate this here. Indeed, in the Court's review of the BET Series, there is little reminiscent of those original creative decisions. Unlike Plaintiff's work, none of the performances in the BET Series features a live audience, much less one including multiple celebrity guests. Plaintiff's work describes a busy party scene in which there are numerous people milling about, dancing partygoers, and musical performances that cause a crowd to "go[] crazy" (Original Treatment ¶¶ A5-A6), after which other celebrities guests approach the artists to congratulate them, much of which is done through the lens of a chatty, flirty hostess. On the other hand, the

performances in Defendants' work never take place during a party.  Somewhat
by definition, the "couchside concerts" in the BET Series showcase the artists
performing alone or accompanied by a small number of people involved in the
performance, such as backup dancers or engineers, reflective of the fact that
the show started in the beginning of the COVID-19 pandemic, when folks were
isolated in their homes.  (*See, e.g.,* Pl. Video 35 (artist appears only with DJ
and two backup dancers)).  The BET Series also features no graphic popups
including information about the artists, and the episodes do not contain pre- or
post-performance commentary provided by a "hostess."  Such creative motifs
are central to Plaintiff's original contributions in the Treatment, and because
the BET Series does not include them, the Court finds that the BET Series does
not contain the same original combination and selections of elements as in
Plaintiff's work.

     "As a matter of logic as well as law, the more numerous the differences
between two works the less likely it is that they will create the same aesthetic
impact so that one will appear to have been appropriated from the other."
*Abdin* v. *CBS Broad. Inc.*, 971 F.3d 57, 69 (2d Cir. 2020) (quoting *Durham Inds.,
Inc.* v. *Tomy Corp.*, 630 F.2d 905, 913 (2d Cir. 1980) (internal quotation marks
omitted)).  This is no exception.  The Court finds, as a matter of law, that such
differences would prevent an average lay observer from recognizing the work
"as having been appropriated from the copyrighted work."  *Peter F. Gaito*, 602
F.3d at 66 (quoting *Knitwaves, Inc.*, 71 F.3d at 1002) (internal quotation marks
omitted); *see also Knitwaves, Inc.* 71 F.3d at 1003 (noting that "fairly subtle

differences between [works]" are enough to defeat a substantial similarity argument); *Fulks*, 207 F. Supp. 3d at 288 (finding that individual differences in design contribute to a lack of overall substantial similarity).[12]

  **b.**  **The Unavailable Episodes**

  There are an additional twenty-six episodes that Plaintiff alleges are substantially similar for which no video evidence exists.  In lieu of direct video evidence, Plaintiff offers a mixture of promotional materials, production one-sheets, and screenshots from each episode as evidence of substantial similarity.  However, these materials only serve to confirm that the works at issue are *not* substantially similar.

  The available materials themselves do not share protectable aesthetic elements or arrangement with Plaintiff's work.  The promotional materials and production one-sheets merely contain the name "House Party" and state that the episode will feature a livestreamed musical act.  (*See, e.g.*, Lebowitz Decl., Ex. 11; Hwang Decl., Ex. 4-6).  The screenshots show a musician or DJ appearing in a livestream, perhaps accompanied by a few additional people. (*See, e.g.*, Lebowitz Decl. ¶¶ 20, 23).  As the Court found in *Walkie Check I*, the title of the work is not itself a protectible element because "[i]t is axiomatic that words, short phrases, titles, and slogans are not subject to copyright."  2022

---

[12] Moreover, the Court does not find that any invitations to "join the party" by artists in the BET Series bolster the level of conceptual similarity.  Plaintiff's work proposed bringing the audience into a literal party that is directly shown and presented on the screen; Defendants' series never shows or invites the audience to witness or vicariously participate in a visible party of the kind described in Plaintiff's work.  Therefore, any statements inviting the audience to "join the party" in the BET Series do not serve the same aesthetic function as they do in Plaintiff's work.

WL 2306943, at *8 (quoting *Moody* v. *Morris*, 608 F. Supp. 2d 575, 579 (S.D.N.Y. 2009), *aff'd*, 407 F. App'x 434 (Fed. Cir. 2011) (summary order)); *see also Bell* v. *Blaze Mag.*, No. 99 Civ. 12342 (RCC), 2001 WL 262718, *2 (S.D.N.Y. Mar. 16, 2001) ("Words and short phrases, such as titles or slogans, are insufficient to warrant copyright protection, as they do not exhibit the minimal creativity required for such protection."). And as the Court has already discussed, Plaintiff's copyright does not grant it exclusive dominion over livestreamed musical performances. Therefore, the Court finds that the similarities that do exist between these materials and Plaintiff's work are not substantial enough to rise to the level of infringement. For the same reasons discussed in the context of the Available Episodes, the common elements presented and arranged in the screenshots and other materials are done in a different manner from those in Plaintiff's work, such that no reasonable observer would regard the two as being the same.

The available materials are also insufficient to create an issue for trial as to whether the *content* of the episodes, if discovered, would be substantially similar. "When the moving party ... has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must set out specific facts showing a genuine issue for trial ... [and] must demonstrate more than some metaphysical doubt as to the material facts ... showing that there is a genuine issue for trial." *Bauer* v. *Yellen*, 548 F. Supp. 2d 88, 91-92 (S.D.N.Y. 2008) (internal quotations marks and citations omitted). Here, Plaintiff has

done no more than raise metaphysical doubt as to whether the content of lost episodes *might* have been substantially similar to the episodes at issue.

Plaintiff asserts that while "it is not entirely possible to know, in detail, precisely what might have formed the content of the 'House Party' episodes Defendants failed to record and preserve … select circumstantial evidence … provides at least some clues as to the nature, themes, and content of the missing … episodes." (Pl. Opp. 33).  Any "clues" offered by available materials are insufficient to create a genuine issue for trial, because, as Plaintiff admits, the promotional materials do not establish with any specificity what the contents of the unrecorded episodes were.  The available materials do not provide enough insight into the content of the videos for a jury to properly determine what the protectable aesthetic elements of the unrecorded videos were.  Conversely, the remainder of the record strongly suggests that these elements are not substantially similar to those in Plaintiff's work.  Therefore, the available materials alone are not enough for Plaintiff to satisfy its burden of proving substantial similarity at trial.

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  The Court has provided the parties adequate time for discovery, and the resulting record available to Plaintiff does not provide a basis for it to establish copyright infringement for the Unavailable

36

Episodes.  Regarding those episodes, Plaintiff has failed to present any "evidence from which a jury might return a verdict in [its] favor." *Anderson*, 477 U.S. at 257.[13]

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, and Plaintiff's cross-motion for spoliation sanctions is DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.   The Clerk of Court is also directed to file this Opinion under seal, viewable to the Court and case participants only.

The parties are hereby ORDERED to submit a joint letter proposing redactions to this Opinion on or before **August 11, 2023.**

SO ORDERED.

Dated:      July 24, 2023
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge

---

[13]    As a final note, conversations Plaintiff may have had with Defendants discussing the increasing utility of livestreaming do not save Plaintiff's case.  (*See* Lebowitz Decl., Ex. 2, 3, 8 (emails from Lebowitz to Defendants' executives regarding livestreaming)). Even assuming that Plaintiff's work anticipated the increasing popularity of livestreamed musical performances and Plaintiff's communications with Defendants alerted them to that trend, it does not follow that Defendants committed copyright infringement by subsequently producing livestreamed musical performances from artists' homes during a worldwide pandemic.  It is irrelevant whether Defendants took conceptual inspiration from Plaintiff's work, when, as here, the Court "confidently concludes that no lay observer would recognize [the Defendants' work] as having been appropriated from the copyrighted work." *Dean* v. *Cameron*, 53 F. Supp. 3d 641, 650 (S.D.N.Y. 2014) (internal quotations and alteration omitted) (holding that the issue of whether the defendant took inspiration from the plaintiff is irrelevant where there is no substantial similarity to the average lay observer).  Because the undisputed record shows that Plaintiff cannot establish the required elements for copyright infringement, any remaining "remedy [for Plaintiff] lies in the court of public or expert opinion and not the federal district court." *Id.*

37